AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

1/29/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RYO _____ DEPTUY

# UNITED STATES DISTRICT COURT

for the

Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT

1/29/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

United States of America

v.

PATRICK JESSE HARRIOTT,

Defendant

Case No.    2:26-mj-00513-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| *Code Sections* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1349 and 1028A; 21 U.S.C. §§ 846 and 841(a)(1) | Conspiracy to commit wire and bank fraud, aggravated identity theft, and conspiracy to distribute controlled substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s *Seth Tugg*
_____
*Complainant's signature*

Special Agent Seth Tugg
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    1/29/2026 at 10:52 a.m.

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

### Count One, 18 U.S.C. § 1349

Beginning in or before 2019, and continuing through January 28, 2026, in Los Angeles County, within the Central District of California, and elsewhere, defendant PATRICK JESSE HARRIOTT and others conspired to commit wire and bank fraud, in violation of Title 18, United States Code, Sections 1343 and 1344.  Defendant and his co-conspirators would steal the identities of victims, and manufacture counterfeit identity documents in the victims' names, but bearing photographs of themselves.  Defendant and his co-conspirators would use the victims' identities and credit to obtain vehicles, rental properties, credit cards, and other goods and services.  Defendant and his co-conspirators used interstate wires to defraud their victims throughout this conspiracy.  Federally-insured financial institutions defrauded by defendant include Citibank, Wells Fargo Bank, and JP Morgan Chase Bank.

### Count Two, 18 U.S.C. § 1028A

Beginning in or before 2019, and continuing through January 28, 2026, in Los Angeles County, within the Central District of California, and elsewhere, defendant PATRICK JESSE HARRIOTT knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Wire and Bank Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

### Count Three, 21 U.S.C. § 846

Beginning in or before 2025, and continuing through January 28, 2026, in Los Angeles County, within the Central District of California, and elsewhere, defendant PATRICK JESSE HARRIOTT conspired with others to knowingly and intentionally distribute controlled substances, including kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(D).

1

2

3

<u>**AFFIDAVIT**</u>

I, Seth Tugg, a Special Agent with HSI, being duly sworn, declare and state as follows:

I.   **PURPOSE OF AFFIDAVIT: COMPLAINT**

1.    This affidavit is made in support of a complaint against PATRICK JESSE HARRIOTT, aka PATRICK JESSEE HARRIOTT JR for conspiracy to distribute controlled substances, conspiracy to commit bank and wire fraud, and aggravated identity theft, in violation of Title 21 U.S.C. §§ 846 and 841(a)(1), and Title 18 U.S.C. §§ 1343, 1344, 1349, and 1028A.  I and other agents arrested HARRIOTT on probable cause on January 28, 2026.

**Incorporated Search Warrant Affidavit**

2.    On January 23, 2026, the Honorable Karen L. Stevenson, Chief Magistrate Judge, issued search warrants in cases for the residence and subject person of HARRIOTT based on the attached affidavit, which is incorporated by reference. As described in the affidavit in support of the search warrants, HARRIOTT and others conspired to fraudulently obtain credit card numbers to spend $500,000 to upwards of $1 million to live a lavish lifestyle travelling the world.  Evidence also supports that HARRIOTT was involved in a more than $2.5 million vehicle loan fraud and shipped multi-kilograms of marijuana from California to Austria.

**Execution of the Search Warrants:  HARRIOTT Fails to Comply with Lawful Commands and Destroys Evidence**

3.    On January 28, 2026, I and other law enforcement officers executed the search warrants targeting HARRIOTT.  The search team loudly announced they were executing search warrants and called the

occupants of HARRIOTT's residence out of the home for safety.  Almost immediately, HARRIOTT's wife, Arielle, and their juvenile son complied and exited the front door of the residence without incident. Then, for several minutes HARRIOTT continued to ignore law enforcement commands to exit the residence. HARRIOTT refused to exit the premises and instead, according to drone video, paced through the first floor of the residence erratically from room to room for several minutes.  Not all of his actions in the house could be observed, but he was seen destroying a cellular phone and cutting his hand in the process prior to exiting the residence.

4.    Some of the items recovered during the search included:

a.    Scores of smartphones.

b.    Scores of debit and credit cards.  Most were in HARRIOTT's name or that of his fraudulent business AP Luxury, but some were not and appear to be victims of identity theft.

c.    Numerous counterfeit identity documents in various names featuring a photograph of someone who looks like HARRIOTT.  The photograph is the same one HARRIOTT used to open a CashApp account that HARRIOTT used to transfer bitcoin, as discussed later.

d.    A Glock 9mm handgun with one 17-round fully loaded magazine inserted into it, and next to a second loaded, extended round magazine containing 42 rounds, which is illegal under California law. Additionally, there was a loaded 10mm magazine with the Glock; however, a 10mm handgun was not recovered. HARRIOTT is a convicted felon. Thus, HARRIOTT cannot possess firearms. (HARRIOTT's wife Arielle denied owning the Glock or even knowing that it was in their house.)

e.    A money counter with accompanying money bands marked for various amounts, including for $5,000 and $10,000 stacks of bills. Additionally, there were numerous money bands and bank envelopes that appeared to be consistent with being previously used.

f.    Watches and other luxury goods with an estimated retail value over $250,000, and approximately $20,000 in cash. (Agents did <u>not</u> take the great majority of the luxury goods in his residence, and estimate their total retail value at over $500,000 on top of the $250,000 worth of luxuries which were seized.)

**HARRIOTT's Statements**

5.    I interviewed HARRIOTT after he waived his *Miranda* rights. HARRIOTT told me the following, among other things:

a.    HARRIOTT admitted leasing luxury cars not using his true Social Security number, as described in the incorporated search warrant affidavit.  HARRIOTT claimed that someone at a credit repair business had told him what he was doing was legal. Over the duration of more than a 90-minute interview, I asked HARRIOTT more than a dozen times about how he earned income; however, I did not receive any specific information about how HARRIOTT paid for his lavish lifestyle, including rent, utilities, vehicle payments, travel and hotels, luxury good purchases, private education tuition for his child, and day-to-day living expenses. HARRIOTT gave various inconsistent explanations, including family inheritance, a trust account, cryptocurrency arbitrage, vehicle arbitrage, vehicle insurance payouts, borrowed money, and personal loans, among others. HARRIOTT was unable to provide any specific information that led me to believe that his income was from any lawful employment.

1          b.   HARRIOTT admitted to not filing taxes since at least
2     2019.

3          c.   HARRIOTT admitted shipping marijuana to Austria (as
4     described in the incorporated affidavit, this was done using a fake
5     return address and a fake names).

6          d.   HARRIOTT admitted to destroying an iPhone he used to
7     communicate with one of his co-conspirators after agents ordered him
8     out of his residence, but claimed that it was to preserve his privacy
9     and not because he was trying to destroy evidence.

10          e.   I asked HARRIOTT about the Glock handgun recovered in
11     the residence. HARRIOTT stated that the firearm was not his.
12     HARRIOTT claimed that his cousin from Arizona frequented the
13     residence and would be the only individual that would bring a gun to
14     the house. HARRIOTT stated that if a firearm was recovered, it must
15     be his cousins and not his.

16          f.   When asked about his wealth, HARRIOTT claimed he had
17     15 to 20 bitcoins (which would be worth about $1.5-$2 million at
18     current prices), but agents were unable to corroborate this.

19          g.   I confronted HARRIOTT about the scores of credit and
20     debit cards and fraudulent identity documents in other names.
21     HARRIOTT admitted possessing the dozens of fraudulent identity
22     documents in other persons' names, but claimed they were just
23     "novelties". Notably, the photographs on the fraudulent identity
24     documents were the same photograph that HARRIOTT used to open a
25     CashApp account. (At least one of the names on the fraudulent
26     identity documents matched the names on credit/debit cards that
27     agents seized.)

28

4

1          **Airelle's Statements:**

2          6.    Airelle Harriott told me that while she is legally married

3     to PATRICK HARRIOTT, they are not intimate and have separate

4     bedrooms.  She said she had left him in the past and was considering

5     doing so again.  She said she is unemployed and described herself as

6     a homemaker.  She said HARRIOTT managed all their finances and paid

7     for everything.  She said she put blinders on and did not ask where

8     their money came from, although she did have doubts about it.  She

9     said she covered her eyes and ears.

10         **HARRIOTT'S CRIMINAL HISTORY**

11         7.    HARRIOTT's criminal history report shows that he has used

12    at least two different social security numbers, and at least three

13    variations of his name — Patrick J. Harriet, Patrick Harriot, and

14    Patrick Harriott, aka "Aries" — as well as the alias "Patrick

15    Solati." At this time, the facts and circumstances of how and why

16    HARRIOTT's name was documented by law enforcement in these variations

17    is unclear; however, based on my training and experience, cagier

18    criminals use different SSNs, and variations in the spelling of their

19    names or aliases, in hopes that it will prevent law enforcement from

20    linking them to all their arrests. My investigation has also revealed

21    that HARRIOTT has ties to at least Georgia, New York, Nevada,

22    Colorado, New Jersey, and California. The current investigation has

23    also revealed that HARRIOTT likely has the financial means to abscond

24    and likely has large amounts of cash and other assets that have yet

25    to be identified.

26         ///

27

28
                                      5

**The 2007 Probation Revocation Triggered by an Armed Robbery, Drugs, and Assault Arrest in Georgia**

8.    According to his criminal history, HARRIOTT was charged in 2007 in Georgia with both possession of marijuana and contributing to the delinquency of a minor. One June 4, 2007, he was sentenced to probation for these offenses after pleading "nolo contendre."

9.    Just one week after beginning his sentence of probation, however, HARRIOTT and three other adult males were arrested on June 11, 2005, in Atlanta, Georgia for Armed Robbery, Possession of Marijuana with the Intent to Distribute, Possession of a Firearm During the Commission of a Felony, and Aggravated Assault with the Intent to Rob (Felony), referencing Atlanta Police Department Case Number 07-19442 and Fulton County Superior Court case number 07SC57622. Notably, the violent criminal conduct was consistent with the armed robbery and related violence that occurred in New York in 2005, as detailed above. Based on my training and experience, I can opine from the underlying offenses that the conduct likely involved HARRIOTT and three other adult males conducting an armed robbery of a marijuana dealer with a firearm. It is unknown if the victim(s) were physically injured. Fulton County Superior Court records show that the case was indicted by the District Attorney's office on June 19, 2007, went through several court proceedings (i.e., discovery obligations, motions, witness lists, etc.), and was subsequently dismissed via nolle prosequi on September 5, 2008. The arrest and related court dispositions are documented in HARRIOTT's criminal history. To date, I have been unable to get the underlying APD arrest report and related charging documents. Agents have submitted an Open

6

Records Request with Fulton County District Attorney's Office and with APD, which is pending and could take up to 30 days. The specific facts and circumstances of the arrest and related criminal case are unknown to me; however, based on my training and experience, I believe that law enforcement had probable cause to arrest and file a criminal case against HARRIOTT, which was subsequently dismissed for unknown reasons. Thus, this was the second incident involving robbery, the use of a firearm, and likely violence by HARRIOTT in less than a two-year period in two different states.

**The 2008 Conviction for First Degree Robbery in New York, and His New Fraud Convictions While on Parole**

10.   As detailed below, HARRIOTT's criminal history shows that he was arrested in Georgia pursuant to an Arrest Warrant for an armed robbery in Nassau County, New York, resulting in charges for First Degree Robbery, Assault with Intent to Cause Bodily Injury with a Weapon, and Criminal Use of a Firearm, among other offenses. This incident is separate and apart from the armed robbery incident that occurred in Atlanta on June 11, 2007, as detailed above. Nassau County Police Department (NCPD) reports regarding an October 11, 2005, robbery show the following. NCPD's investigation took several months to advance the investigation and positively identify HARRIOTT as one of the suspects involved in this violent incident. According to the police reports, HARRIOTT and another co-conspirator each aimed loaded firearms at two victims during an armed robbery. HARRIOTT was in possession of a 9mm firearm and his co-conspirator possessed a .38 firearm. HARRIOTT and another co-conspirator also struck both victims in the face with the loaded firearms which caused multiple

lacerations to the victims' faces. One of the victims fled and was
shot in the leg. Both victims survived. In total, HARRIOTT and his
co-conspirator robbed the victims of approximately $254, a black and
red jacket valued at $500, and a 2003 White Chevrolet Impala. Several
months later, in April 2006, HARRIOTT's co-conspirator was arrested
and subsequently convicted; however, at this time HARRIOTT's identity
was not known to law enforcement. Then, in June 2006, the
investigators identified HARRIOTT as the other suspect involved in
the armed robbery. Additionally, the victim reported that it was
HARRIOTT that shot in the direction of the victim while he was
running, wounding the victim. Investigators were unable to locate
HARRIOTT and determined that he was likely hiding out in New Jersey.
The District Attorney's office declined to issue an Arrest Warrant in
the investigation until HARRIOTT was physically located.

      11.  Approximately 18 months later in 2007, HARRIOTT was
involved in multiple unrelated criminal matters in Georgia, as
detailed above. At this time, the District Attorney's office issued
an Arrest Warrant for HARRIOTT because his whereabouts were then
known, and he was subsequently extradited to New York. Based on my
training and experience, I believe that HARRIOTT knew he was likely
wanted by the police for the October 2005 armed robbery incident but
intentionally fled the state to elude detection by law enforcement.
Thus, it appears that HARRIOTT eluded arrest for more than two years
for pistol-whipping and shooting a victim.

      12.  HARRIOTT was subsequently extradited from Georgia to New
York related to the original October 11, 2005 incident. HARRIOTT pled
guilty in 2008 to First Degree Robbery and was sentenced to prison

8

for seven years. His criminal history states that his parole "Supervision Date [was] 2012-10-26," which was his "Initial Release to Parole," with a final "Release Date [of] 2017-10-25," exactly five years.  Before this termination of his parole, however, HARRIOTT was arrested and convicted again in July of 2014 of credit card fraud in Connecticut and sentenced to one year of jail, suspended, and two years of probation. Then in January of 2016 — while he was still on probation for the Connecticut credit card fraud, and still on parole for the New York armed robbery — HARRIOTT was arrested again for possession of a forged instrument and sentenced to 11 months in jail in New York. The facts and circumstances regarding the 2014 and 2016 incidents are detailed below.

**The 2014 Conviction for Credit Card Fraud and Additional Information**

13.  As detailed above, HARRIOTT was convicted in July 2014 of credit card fraud in Connecticut. Notably, HARRIOTT was still on parole in New York. Thus, HARRIOTT likely traveled in interstate commerce to commit new crimes, i.e., New York to Connecticut. At this time, it is unknown if HARRIOTT received permission to travel out of the state of New York; however, based on my training and experience, I think it was unlikely HARRIOTT received permission to travel to Connecticut. The conviction was related to an original arrest that occurred on February 16, 2014. Police reports show that two New Haven Police Officers were working an extra duty assignment at / near a local store when they were notified by an employee of an incident. Specifically, the two police officers were notified that a black male had taken a stolen credit card and ran from the store, later

1  identified as HARRIOTT. The two NHDPS Police Officers gave chase;
2  however, HARRIOTT eluded the police officers and ultimately got into
3  a vehicle and sped off.

4      14.  Shortly thereafter, the police were able to locate and stop
5  the vehicle and detained HARRIOTT and an adult female co-conspirator
6  pending further investigation. When confronted by police officers why
7  HARRIOTT ran, HARRIOTT denied being in the store. A subsequent search
8  of HARRIOTT's vehicle seized several items of evidentiary value,
9  including (2) fraudulently purchased Xbox gaming consoles (valued
10 over $500 each), 28 various fraudulent credit cards, and (2) prepaid
11 Mastercard visa cards (each valued at $500), and (10) Visa prepaid
12 credit cards with unknown values. HARRIOTT's use of fraudulent credit
13 cards was corroborated by CCTV in store, receipts recovered in the
14 vehicle, witness interviews, and the investigation. HARRIOTT and the
15 adult female co-conspirator were arrested and subsequently convicted
16 for credit card fraud. Notably, this was at least the second known
17 incident in which HARRIOTT attempted to elude law enforcement as part
18 of a criminal investigation.

19     **The 2016 Conviction for Credit Card Fraud and Additional**
20     **Information**

21     15.  As detailed above, HARRIOTT was arrested and convicted in
22 2016 of credit card fraud in New York. The conviction was related to
23 an original arrest that occurred on January 5, 2016. Notably,
24 HARRIOTT was still on parole in New York. In summary, a WSPD police
25 officer observed HARRIOTT conducting suspicious purchase transactions
26 inside a local store. Specifically, the WSPD police officer noticed
27 HARRIOTT at a register attempting to purchase something at a register
28

using his phone; however, HARRIOTT observed the police officer,
quickly stopped the transaction, went to another register, and
subsequently departed the store. HARRIOTT and another co-conspirator
then departed in a vehicle, which was later determined to be a rental
vehicle in HARRIOTT's name. The WSPD police officer went into the
store and learned that HARRIOTT was attempting to purchase gift cards
but changed his mind and subsequently left. WSPD subsequently
initiated a traffic stop on the vehicle, which included HARRIOTT as
the front passenger and an adult male co-conspirator as the driver.
HARRIOTT denied attempting to purchase any gift cards. WSPD police
officers then observed in plain view four cellular phones and a
plastic shopping back with numerous gift cards sticking out. WSPD
requested assistance from the New York State Police and the United
States Secret Service (USSS). Several items of evidentiary value were
seized from HARRIOTT's person and rental car pursuant to a court
authorized search, including (5) cellular phones), at least (12)
prepaid VISA cards containing $500 each, (2) Home Depot gift cards
containing $500 each, and more than (12) credit cards, including
forged and fraudulently obtained. HARRIOTT and the adult male co-
conspirator were arrested and subsequently convicted for credit card
fraud.

**HARRIOTT has Shown an Ability to Create and Use Stolen
Identities and Fraudulent Documents**

16.  Although not mentioned in the incorporated search warrant
affidavit, my investigation has also identified multiple times in
which HARRIOTT assumed the identity of a victim, created a fraudulent
document, and used financial institutions in furtherance of the

SUBJECT OFFENSES. For ease of reference, I will refer to the adult victim by his initials and state of residency, identified as PK-CA.

17.  Specifically, my investigation revealed that HARRIOTT opened and used a Blockchain.com wallet account[1], a CashApp (Block, Inc.) account, and fraudulently obtained credit cards using the identity of PK-CA in at least 2022, 2023, and 2024. For example, HARRIOTT opened and used a Blockchain.com wallet account between on February 11, 2022, to January 31, 2023, using PK-CA's identity and a fraudulent California driver's license (CA-DL), referencing Blockchain ID 13964231-81af-4410-b1b5-ec4e7335a0a6. Notably, the name and DOB were PK-CA's; however, the driver's license number was associated with another victim's legitimate license number. As detailed below, this same fraudulent driver's license and identity were used in various other fraud schemes during the same period, including the use of a CashApp account.

18.  HARRIOTT submitted his real photograph and an image of a CA-DL. The CA-DL used an address I identified by sight as a former address for HARRIOTT and victim PK-CA's real name and date of birth and another victim's license number on the fraudulent CA-DL. The CA-DL had an image of an individual that was not PK-CA or HARRIOTT;

_____

[1] In general, a Blockchain.com wallet supports major cryptocurrencies like in its non-custodial wallet, among others. Generally, most Blockchain wallets hold assets across different networks allowing management of various digital assets. Blockchain.com account creation requires Know Your Customer (KYC) requirements. KYC is the first stage anti-money laundering (AML) due diligence and is the identity verification process used by crypto exchanges and platforms to confirm users are legitimate, preventing financial crime like money laundering by collecting personal data (name, ID, address) and verifying it against official records, aligning crypto with global financial regulations and building trust. It involves steps like submitting government IDs, selfies, and sometimes enhanced checks to comply with AML/CTF laws, ensuring security and enabling wider adoption.

however, at first glance HARRIOTT's self-portrait photograph submitted and the image on the CA-DL could appear confusingly similar and passed authentication. Based on my training and experience, I believe this example shows HARRIOTT's ability to obtain, possess, and use fraudulent documents in furtherance of the SUBJECT OFFENSES, and likely be able to elude detection by law enforcement. An image of

 

HARRIOTT's self-image (on the left) and the fraudulent CA-DL in the name of victim PK-CA as part of the KYC process is depicted below. Notably, the image on the fraudulent CA-DL is the *same image* that appeared on the majority of the fraudulent identity documents recovered during the search warrant looked like this:

19. HARRIOTT also opened a CashApp (Block, Inc.) account using the same fraudulent identity, referencing CashApp account C_ne2twgy51. Specifically, between May 14, 2022, to July 15, 2023, HARRIOTT conducted and/or attempted more than $400,000 in transactions in and out of the CashApp account, including 53 Bitcoin (BTC) withdrawals to external wallets successfully processed for 0.7942993 BTC (worth approximately $25,325.16 USD at the time of the transfers). The BTC payments in and out of the CashApp account likely originated from HARRIOTT's fraudulently obtained Blockchain wallet, as detailed above. Per banking and law enforcement sources, these

external BTC transfers were high-risk due to being associated with identified fraud shops "Btc2pm.me - PinPays - UAPS" and "JW STORE - telegram bot shop". These entities were known for selling compromised personal identifiable information (PII), as well as stolen credit card data, which can facilitate both identity theft and payment card fraud. Payments made to these stores indicate HARRIOTT likely purchased and/or attempted to purchase illegal products or services. Based on my training and experience, I believe this indicates HARRIOTT's ability to likely access the darkweb and procure stolen identity information in furtherance of the SUBJECT OFFENSES and could likely assist HARRIOTT if he attempted to elude detection by law enforcement.

///

## II.  **CONCLUSION**

20.  Based upon the foregoing facts and my training and experience, I believe there is probable cause to believe that HARRIOTT conspired to distribute controlled substances, conspired to commit bank and wire fraud, and committed aggravated identity theft, in violation of 21 United States Code, Sections 846 and 841(a)(1), and 18 United States Code, Sections 1343, 1344, 1349 and 1028A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _____ day of January, 2026.


_____
UNITED STATES MAGISTRATE JUDGE

**AFFIDAVIT**

I, Chad Lindsly being duly sworn, declare and state as follows:

**INTRODUCTION**

1.    I have been a Special Agent with Homeland Security Investigations (HSI) since December of 2010. My formal education includes a Bachelor of Science in the Administration of Justice and a Post-Baccalaureate Accounting Certificate from Portland State University in Portland, Oregon. Since November 2023, I have been assigned to the HSI Office of International Affairs in Vienna, Austria as the Assistant Attache. As of October 2025, I am the Acting Attache and the regional representative for Department of Homeland Security. My Area of Responsibility includes Austria, Slovakia, Slovenia, Croatia, Hungary, Czech Republic, Bosnia and Herzegovina, Serbia, and Montenegro.

2.    Previously, I was assigned to the HSI Office of the Assistant Special Agent in Charge, in Portland, Oregon where I worked for over six years, including three years as a Task Force Agent with the Drug Enforcement Administration. My investigations included drug offenses, violent crime, financial crimes, and fentanyl overdose deaths. Prior to my assignment in Portland, Oregon, I was assigned to the HSI Office in Calexico, California, where I worked for over six years. During my tenure, I was assigned to the Calexico East Port of Entry with emphasis on narcotics smuggling.

3.    My formal law enforcement training includes successfully completing the 23-week HSI basic training course at the Federal Law Enforcement Training Center in Glynco, Georgia. During the training, I learned how controlled substances are manufactured, consumed,

packaged, marketed, and distributed. I also learned the basics
regarding financial, immigration, and other types of investigations.

## I. **PURPOSE OF AFFIDAVIT: SEARCH WARRANTS**

4. This affidavit is made in support of search warrants for
the residence and person of PATRICK JESSE HARRIOTT, aka PATRICK JESSE
HARRIOTT JR for evidence, contraband, fruits, or instrumentalities of
criminal violations of Title 21 U.S.C. §§ 846 and 841(a)(1)
(Possession with the Intent to Distribute a Controlled Substance and
Conspiracy), and Title 18 U.S.C. §§ 1343 (Wire Fraud), 1344 (Bank
Fraud), 1349 (Attempt and Conspiracy to Commit Bank and Wire Fraud),
1028A (Aggravated Identity Theft), and 1956 (Money Laundering)
(collectively, the SUBJECT OFFENSES"), as described in Attachment B,
which is incorporated by reference.

5. The information set forth in this affidavit is based upon
my participation in the investigation, encompassing my personal
knowledge, observations and experience, as well as information
obtained through my review of evidence, investigative reports, and
information provided by others, including other law enforcement
partners. As this affidavit is being submitted for the limited
purpose of securing the requested warrants, I have not included each
and every fact known to me concerning this investigation. I have set
forth only the facts that I believe are necessary to establish
probable cause for the requested warrants.

## II. **PREMISES AND PERSON TO BE SEARCHED**

6. The premises and person to be searched are:

a. The premises identified as Los Angeles County Office
of the Assessor bearing ID Number 2049-011-018, commonly known

2

as 24307 LITTLE VALLEY ROAD, HIDDEN HILLS, CA 91302 (the **"SUBJECT PERMISES"**), described more fully in Attachment A-1, which is incorporated by reference.

b.   The person of Patrick Jesse HARRIOTT, aka Patrick Jesse HARRIOTT Jr (the **"SUBJECT PERSON"**), who resides at the **SUBJECT PREMISES**, and is described more fully in Attachment A-2, which is incorporated by reference.

III. **STATEMENT OF PROBABLE CAUSE**

**A. Summary of Investigation**

7.   Homeland Security Investigations (HSI) has been investigating an Organized Crime Group (OCG) operating in the United States, Austria, and elsewhere involved in credit card fraud, identity theft, loan fraud, narcotics trafficking, and other crimes since January 2024. As part of this investigation, HSI identified Patrick Jesse HARRIOTT (i.e., the **SUBJECT PERSON**), a United States citizen and resident of the greater Los Angeles, California area, and KIM DINH, an Austrian citizen and a resident of the greater Vienna, Austria area, as individuals involved in the OCG and the fraud and narcotics schemes, among others. The financial fraud scheme has occurred from at least September 23, 2019, to present and the narcotics trafficking from at least September 1, 2025, to present.

8.   In total, the investigation has identified more than $500,000 in credit fraud directly and indirectly attributable to HARRIOTT, DINH, and other co-conspirators; however, I believe that the credit fraud is significantly under reported and likely exceeds more than $1,000,000. Based on my training, experience, and investigation to date, I believe this for several reasons, including

that many victims do not file police reports, and the fraud occurred internationally, making it harder to obtain records. I have also identified more than $2.5 million in vehicle loan fraud directly attributable to HARRIOTT. The investigation has also seized multi-kilograms of marijuana shipped by HARRIOTT from California to DINH in Austria, including as recently as November 4, 2025.

9.    In summary, HARRIOTT, DINH, and other co-conspirators used fraudulently obtained credit card numbers to live a lavish lifestyle traveling around the world, including purchasing airline tickets (primarily first class and business class), staying at luxurious hotels, fine dining, obtaining spa services, and purchasing luxury goods in foreign countries throughout the world. My initial investigation started with DINH. Then, the continued investigation subsequently identified HARRIOTT and other co-conspirators. DINH recruited other woman to travel with HARRIOTT and DINH, which was paid for by HARRIOTT and/or DINH using fraudulently obtained credit card numbers. In exchange, the women likely engaged in sex and spent time with HARRIOTT, DINH, and the other co-conspirators during these international rendezvouses. This was corroborated by explicit messages recovered from DINH's phone during a border search at Chicago O'Hare International Airport in September 2025.

10.    Generally, DINH, HARRIOTT, and other co-conspirators booked hotel accommodations primarily through Booking.com ("BDC") and airfare accommodations directly through third party websites. DINH, HARRIOT, and co-conspirators provided their real identifying information but used fraudulently obtained credit card numbers. The investigation revealed that BDC and the other third-party platforms

4

were likely used because it was based in The Netherlands and BDC's online e-commerce platform did not use 2-Factor Authentication ("2FA") to run credit cards. The use of BDC has also made it difficult for U.S. law enforcement to investigate. Specifically, BDC does not respond to U.S. legal process except a Mutual Legal Assistance Request (MLAR). As part of my ongoing investigation, I have served and received records from BDC pursuant to an MLAR. A review of BDC's records has corroborated a part of my investigation; however, I have reviewed the documents and determined that a large amount of the requested records regarding specific identified fraudulent purchases were not provided by BDC for unknown reasons. Despite this, I have identified HARRIOTT, DINH, and other co-conspirators through internal fraud investigations conducted by the credit card lenders.

11.   The investigation has identified at least eight additional women, including citizens in Austria, France, and Germany, including Bettina STRASSER, Rebecca BURGMANN, Ayra SHEIKH, Le Quyen NGUYEN. The additional women were identified several ways, including phone numbers, border crossing records, internal bank investigations, and other various investigative techniques. In general, most of the fraud was committed internationally (i.e., outside of the United States) and not in the geographic area of where HARRIOTT, DINH, and other co-conspirators resided. This modus operandi complicated investigative efforts by U.S. and foreign law enforcement to conduct a thorough investigation and determine the proper venue for prosecution. Additionally, often the fraud purchases were not identified until days or weeks after the purchases were made and the travel was

1  completed and were only documented by U.S. financial institutions

2  filing fraud reports retroactively.

3      12.  Ultimately, the hotels, restaurants, airlines, and other

4  businesses generally did not sustain direct losses because the

5  purchases were authorized and the businesses were paid. The victims

6  whose credit cards were used then reported the transactions as

7  fraudulent to the credit card companies and were subsequently not

8  liable for the fraudulent credit card transactions. Thus, the

9  businesses and victims (i.e., the owners of the credit cards) did not

10 sustain direct losses, which minimized the businesses and victims'

11 interest in reporting the crimes to domestic and foreign law

12 enforcement and for law enforcement to investigate. In the end,

13 generally the U.S. financial institutions attributable to the credit

14 cards sustained the direct losses.

15     13.  I have identified more than 17 credit card numbers

16 fraudulently used from various U.S. financial institutions during the

17 relevant period, including Citibank, JP Morgan Chase, Wells Fargo,

18 and others. I have corroborated the fraudulent use several ways,

19 including speaking with authorized bank representatives, foreign law

20 enforcement, and multiple victims of the fraud. I have also reviewed

21 various records, including bank records, internal fraud reports,

22 various business records, and have conducted an extensive analysis of

23 border crossing records for HARRIOTT, DINH, and other co-

24 conspirators.

25     14.  The investigation has identified more than 20 lavish

26 international trips directly and indirectly attributable to HARRIOTT,

27 DINH, and others funded by credit card fraud between at least

28

September 23, 2019, to April 7, 2024, including the Panama, United Kingdom, U.S. Virgin Islands, French Polynesia, Spain, France, Italy, Ireland, Germany, Vietnam, Jamaica, Philippines, Qatar, United Arab Emirates, Maldives, Mexico, Turks and Caicos, and South Africa, among others. I have also identified several trips taken within the domestic United States during the same relevant period, including in California, Arizona, Nevada, and New York. I have continued investigating and monitoring HARRIOTT's international travel and have identified additional international trips consistent with HARRIOTT's modus operandi, including to Mexico (June 2024), Turks and Caicos Islands (June 2024), and the Bahamas (November 2025). At this time, I have not determined if the trips were fraudulently funded; however, based on my training, experience, and investigation to date, I believe that it is likely that HARRIOTT traveled on the trips and committed the SUBJECT OFFENSES. During the identified relevant period of the SUBJECT OFFENSES, HARRIOTT and Arielle HARRIOTT would use their current US Passport to depart and enter the United States, which was captured at time of departure and entry by Customs and Border Protection (CBP) at the Ports of Entry. I have identified several passports used by HARRIOTT and Arielle HARRIOTT relevant to my investigation into the SUBJECT OFFENSES, including US Passport Book Numbers A00903047 and 537238863 in the name of "PATRICK JESSE HARRIOTT" and US Passport Book Numbers A33083003, A00903048, and A11649407 in the name of "ARIELLE LAUREN HARRIOTT". The passports are relevant to my ongoing investigation because they would include entry and exit stamps for countries visited when the SUBJECT OFFENSES were committed.

15.    The fraud also included trips in which HARRIOTT traveled with his family, including Arielle HARRIOTT (his spouse) and J.H. (his juvenile son), i.e., HARRIOTT purchased J.H.'s airfare and other travel expenses fraudulently. I am intentionally using the initials of HARRIOTT's son because he is a juvenile. J.H. was born in 2015. Currently, it is believed that Arielle HARRIOTT is a co-conspirator in the overall fraud scheme and that J.H. likely is unaware of the fraud that his parents are involved in.

16.    The investigation also revealed that HARRIOTT was directly involved in identity theft and vehicle loan fraud concurrently with the credit card fraud scheme. In general, the two fraud schemes supported a lavish lifestyle that HARRIOTT and other co-conspirators would otherwise not be able to pay for. Specifically, HARRIOTT would apply for vehicle loans at high-end car dealerships in the greater Los Angeles, CA area using his real identifying information (i.e., name, date of birth, driver's license number, address, etc.) and a fraudulently obtained SSN (i.e., a victim) for luxury vehicles.

17.    Based on my training and experience, this is a form of identity theft that I refer to "hybrid synthetic identity theft". I know that there are generally two types of identity thefts, including synthetic and traditional. Synthetic identity theft is a type of fraud in which a criminal combines stolen real information without the knowledge of the victim and fake information to create a new identity. Traditional identity theft is a type of fraud in which a criminal steals real information and uses it without the knowledge of the victim. In this case, I believe that HARRIOTT has created a variation of both, a hybrid synthetic identity theft. For example,

8

HARRIOTT has used some of his real personal identifying information (i.e., name, DOB, driver's license, etc.) and has used Victims' PII (i.e., SSN) to create a hybrid synthetic identity. Synthetic identity theft, or in this case hybrid synthetic identity theft, is one of the most difficult types of fraud to detect and to protect against. For example, filters employed by financial institutions may not be sophisticated enough to identify when it occurs, i.e., on initial loan, credit card, and rental applications. When the synthetic identity thief applies for an account, it may seem like a real customer with limited credit history. Over time, the credit reports for the hybrid synthetic identity (i.e., HARRIOTT and the victims) become merged and confusingly difficult to decipher. In this case, HARRIOTT provided his real information except for his SSN. HARRIOTT instead used his victims' SSNs so that his fraud would be attributed to their credit reports, and not his own. Based on my training and experience, I believe that HARRIOTT intentionally used victims' SSNs to intentionally obfuscate the loan applications to create a hybrid synthetic identity to fraudulently obtain a favorable lease outcome.

18.  To date, the investigation has identified at least 12 loan applications at various luxury dealerships between at least September 1 2020, to January 6, 2025, in the greater Los Angeles, California area. In total, HARRIOTT applied for financing for more than $2.5 million in vehicle loans fraudulently. A review of the loan application documents revealed that HARRIOTT used Victim 1's social security number on 11 of 12 applications.[1] Additionally, HARRIOTT

---

[1] The investigation has also identified at least one bank account at Wells Fargo that HARRIOTT opened using Victim 1's SSN, identified as Wells Fargo Account X3718. The account was opened in 2018 and subsequently closed in 2023. This was the first use of

1  would provide fake financial declarations and income statements,

2  inflating his wealth and income. Several times, HARRIOTT's credit

3  applications were declined because of the internal investigations

4  conducted by banks as part of the loan application process; however,

5  HARRIOTT did successfully apply for and obtain financing for at least

6  nine high-end luxury vehicles, including a 2020 Lamborghini Urus

7  (valued at $247,259), a 2017 Rolls-Royce Wraith (valued at $238,990),

8  a 2020 Lamborghini Urus (valued at $184,815), a 2021 Porsche 911

9  Turbo (valued at $275,000), a 2021 Mercedes-Benz S580 (valued at

10 $139,000), a 2022 Porsche Taycan (valued at $174,770), a 2023 Porsche

11 Cayenne (valued at $91,949), a 2022 Porsche 911 (valued at $278,000),

12 and a 2024 Lamborghini Urus (valued at $319,522). To date, HARRIOTT

13 is no longer in possession of any of the identified vehicles.

14 HARRIOTT usually only kept these vehicles for several months, and

15 subsequently "turned in" the vehicles to the dealership and applied

16 for and obtained a new vehicle. In February 2025, I coordinated with

17 one of the dealerships and successfully recovered the 2024

18 Lamborghini Urus that was fraudulently obtained in January 2025.

19 HARRIOTT was subsequently notified by the vehicle dealership that his

20 previous loan applications were identified as fraudulent (i.e., the

21

22 Victim 1's SSN that I have identified. Based on a review of bank
   records, the account was closed by the financial institution on
23 suspicion of money laundering. Victim 1 was born in 2004. Thus,
   Victim 1 was a minor when HARRIOTT likely first used Victim 1's SSN
24 in 2018. Thus, it was likely that Victim 1's SSN had not been
   reported yet to credit bureaus and why the bank accounts and
25 subsequent vehicle loans were likely processed and approved. In
   January 2025, I conducted a telephonic interview with Victim 1. In
26 summary, Victim 1 was not aware that she was likely a victim of
   identity theft; however, a subsequent review of Victim 1's credit
27 report confirmed my ongoing investigation. Victim 1 did not authorize
   any individual to use her SSN and has since filed a police report
   documenting the unauthorized use of Victim 1's SSN.

28

use of Victim 1's SSN and altered bank statements). As detailed herein, the coordination with the dealership and the subsequent recovery of the 2020 Lamborghini Urus assisted in identifying and confirming the **SUBJECT PREMISES**.

19.   In November 2025, I was contacted by Austrian authorities regarding the seizure of approximately 2.36 kilograms of marijuana concealed in a mail parcel originating from Los Angeles, California, destined to Vienna, Austria. The parcel was shipped via the United States Postal Service (USPS). The parcel was interdicted by Austrian authorities on or about November 4, 2025. In summary, the Austrian authorities requested assistance in conducting the investigation, including identifying the sender of the parcel and the intended recipient.

20.   Initially, the sender of the parcel and those directly involved in the international mailing of the marijuana-laden parcel from the United States to Austria was unknown to me and the Austrian authorities. As detailed herein, my subsequent investigation revealed that the sender of the marijuana-laden parcel was HARRIOTT and the likely intended recipient was DINH. Thus, my previous financial fraud investigation into HARRIOTT and DINH merged with the newly identified narcotics investigation. HARRIOTT was identified as the sender several ways, including CCTV footage and rental car information. DINH was identified as the likely intended recipient based off IP address queries of the drug-laden parcel and the existing known relationship between HARRIOTT and DINH.

21.   To date, I have identified at least six additional parcels attributable to HARRIOTT that were shipped from the greater Los

Angeles, California area to the greater Vienna, Austria area between approximately September – November 2025. I have attributed the additional parcels to HARRIOTT and DINH several ways, including CCTV footage, use of the same credit card for payment, and IP address activity. The contents of the parcels are currently unknown; however, based on my training, experience, and investigation to date, I believe the other parcels likely contain approximately two kilograms of marijuana per parcel. I have also identified a parcel that Customs and Border Protection (CBP) interdicted at the Los Angeles airmail sorting facility on November 12, 2025, containing 1.86 kilograms of marijuana. My subsequent investigation identified HARRIOTT as the sender and DINH as the likely intended recipient.

22.  My investigation is still ongoing into HARRIOTT, DINH, and other likely known and unknown co-conspirators in violation of the SUBJECT OFFENSES. However, based on the investigation to date and detailed herein, I believe that Patrick Jesse HARRIOTT (i.e., the **SUBJECT PERSON**), Kim DINH, and other co-conspirators are involved in multiple sophisticated fraud schemes and narcotics trafficking scheme in the Central District of California and elsewhere and that HARRIOTT (i.e., the **SUBJECT PERSON**) resides at and uses the **SUBJECT PREMISES** in furtherance of the SUBJECT OFFENSES.

23.  I therefore believe that a search of the **SUBJECT PREMISES** and **SUBJECT PERSON** will provide me with valuable information, including in evidence corroborating my investigation that HARRIOTT, DINH, and others that are committing various fraud schemes and narcotics trafficking in furtherance of the SUBJECT OFFENSES. I also believe that the search of the **SUBJECT PREMISES** and **SUBJECT PERSON**

will assist law enforcement in disrupting the fraud schemes and international narcotics trafficking of HARRIOTT, DINH, and other co-conspirators, and could potentially thwart more victims from being financially harmed.

24. The **SUBJECT PERSON** of my investigation is Patrick Jesse HARRIOTT. HARRIOTT resides the **SUBJECT PREMISES** and has since at least October 2024. The **SUBJECT PREMISES** is in a Hidden Hills HOA gated community with private security and controlled entry and exit. The investigation has revealed that HARRIOTT rents the **SUBJECT PREMISES** for $16,000 per month. This was corroborated by HARRIOTT's most recent fraudulent vehicle loan application in January 2025, a review of bank records and counter withdrawals in the amount of $16,000 in October, November, and December 2024 and January 2025, court authorized prospective geolocation for HARRIOTT's Phones from at least January 1, 2026, to Date of Warrant, and a review of historical cell site records for HARRIOTT's Phones from at least October 19, 2025, to December 17, 2025, and covert physical surveillance as recently as January 5, 2026, as detailed herein. HARRIOTT is purportedly "self-employed" and owns his own company named AP LUXURY COLLECTIONS LLC and has since at least August 2020. The investigation has identified at least five cellular phones used by HARRIOTT, including the (210) 974-0145 ("HARRIOTT's Phone 1") and 310-922-5198 ("HARRIOTT's Phone 2" and collectively referred to as "HARRIOTT's Phones"). HARRIOTT is the listed subscriber of HARRIOTT's Phone 1 and has used it since at least September 2018. This was corroborated by a review of subscriber records, bank records, and a review of vehicle loan

applications in which HARRIOTT provided HARRIOTT's Phone 1 as his cellular phone, court authorized geolocation information, and a review of historical cell site records. HARRIOTT's business, AP LUXURY COLLECTIONS LLC, is believed to be the subscriber of HARRIOTT's Phone 2 and has been since at least March 2025. HARRIOTT's Phone 2 is also linked to HARRIOTT's CashApp account name "Patrick Jesse Harriott" and handle "$harrystyles1090". As detailed herein, HARRIOTT's Phone 2 was listed as HARRIOTT's cellular phone on a Hertz Rental application in October 2025 for a vehicle that HARRIOTT used to mail a marijuana-laden parcel from Los Angeles, California, to Vienna, Austria containing 2.36 kilograms of marijuana. On December 17, 2025, I applied for and obtained court authorization for prospective live tracking via GPS coordinates for 45 days and historical information associated with HARRIOTT's Phones, referencing case number 2:25-MJ-7821. The court authorization has greatly assisted my investigation and has confirmed HARRIOTT as the user of HARRIOTT's Phones and HARRIOTT's residence as the **SUBJECT PREMISES.** The investigation has also identified HARRIOTT's Apple accounts as the patrickharriott@icloud.com and Destination Signaling Identifier ("DSID") 16165910171 ("HARRIOTT's Apple Account 1"), harryservices59@8cloud.com and DSID 12289199827 ("HARRIOTT's Apple Account 2"), and patrickharriott@luxuryapcollections.com and DSID 17414243843 (HARRIOTT's Apple Account 3" and collectively referred to as "HARRIOTT's Apple Accounts"). As detailed herein, this was corroborated by a review of subscriber records, bank records, a review of vehicle loan applications, records received from Apple,

14

and the investigation to date. Subsequent record checks revealed that HARRIOTT is a multistate offender and a convicted felon, referencing FBI No XXXXXXJC5. HARRIOTT's criminal history spans more than 18 years and includes similar conduct to the Subject Offenses. Specifically, a misdemeanor possession of marijuana less than 1 oz (2007), felony armed robbery 1st degree – displays what appears to be a firearm (2008), misdemeanor credit card fraud (2014), and felony and misdemeanor possession of forged instrument – 2nd degree (2016).

IV. **FRAUDULENT CREDIT CARD SCHEME EXAMPLES**

25. As detailed herein, I have identified at least 20 lavish international trips directly and indirectly attributable to HARRIOTT, Arielle HARRIOTT, DINH, and other co-conspirators funded by credit card fraud between at least September 23, 2019, to April 7, 2024, including the Panama, United Kingdom, U.S. Virgin Islands, French Polynesia, Spain, France, Italy, Ireland, Germany, Vietnam, Jamaica, Philippines, Qatar, United Arab Emirates, Maldives, Mexico, Turks and Caicos, and South Africa, among others. I identified HARRIOTT, Arielle HARRIOTT, DINH, and others as those directly involved with the fraudulent trips several ways. I have reviewed bank records, internal fraud reports, various business records, and have conducted an extensive analysis of border crossing records for HARRIOTT, Arielle HARRIOTT, DINH, and other known co-conspirators.

26. For example, on December 31, 2019, Patrick HARRIOTT, Arielle HARRIOTT, J.H. (i.e., HARRIOTT's juvenile son), and two other adult co-conspirators departed Los Angeles International Airport (LAX) on flight AA2726 to Sangster International Airport, Montego

15

Bay, Jamaica (MBJ), according to border crossing records. Several days later, on January 6, 2020, HARRIOTT, Arielle HARRIOTT, J.H., and two adult co-conspirators departed MBJ on Flight AA2500 to Dallas Ft. Worth International Airport (DFW). Thus, between December 31, 2019, to January 6, 2020, HARRIOTT, Arielle HARRIOTT, J.H., and two adult co-conspirators were in Jamaica. At this time, it is unknown how the airline tickets were paid for; however, based on my training, experience, and investigation to date I believe that the airline tickets were likely fraudulently purchased.

27.   My subsequent investigation identified fraudulent credit card transactions during the period HARRIOTT, Arielle HARRIOTT, J.H., and two adult co-conspirators were in the same geographic area and that were directly attributable to HARRIOTT and Arielle HARRIOTT. Specifically, bank records show that during the period of December 31, 2019, to January 6, 2020, the Citibank credit card ending in X2558 was fraudulently charged more than $7,200, including approximately $3,500 at Sunscape Montego Bay Resort in Montego Bay, Jamaica. A subsequent review of the supporting records revealed that all of transactions were reported by the card holders as fraud. Citibank's subsequent investigation also determined that the transactions were fraudulent and the victim was not held liable. Ultimately, Citibank incurred a complete loss on the amount. A review of the records revealed that the two purchases were for two rooms at Sunscape Montego Bay. One room was rented in the name of HARRIOTT and shared with Arielle HARRIOTT and the other room was rented in the name of an adult co-conspirator. Both rooms were charged on Citibank credit card ending in X2558. A photocopy of HARRIOTT, Arielle

HARRIOTT, and two adult co-conspirators' US passports were copied by the hotel at time of check-in. I have reviewed the two images and have determined them to be authentic and the passports that HARRIOTT and Arielle HARRIOTT used to travel from LAX to MBJ. Thus, HARRIOTT and Arielle HARRIOTT were confirmed. Based on my training, experience, and investigation to date, I believe that one of the two rooms rented was likely occupied by HARRIOTT, Arielle HARRIOTT, and J.H. and the other room was occupied by two adult co-conspirators.

28. Another example was on October 16, 2020, when airline records showed the following. Arielle HARRIOTT and J.H. (i.e., HARRIOTT's juvenile son) departed LAX on flight TN111 to Faa'a International Airport, Papeete, French Polynesia, aka Tahiti International Airport (PPT), according to border crossing records. The following day, on October 17, 2020, HARRIOTT departed LAX on flight TN111 to PPT. At this time, it is unknown how the airline tickets were paid for or why HARRIOTT departed separately; however, based on my training, experience, and investigation to date I believe that the airline tickets were likely fraudulently purchased. Several days later, on October 25, 2020, HARRIOTT, Arielle HARRIOTT, and J.H. departed PPT on flight TN2 to LAX. Thus, between October 17 – 25, 2020, HARRIOTT, Arielle HARRIOTT, and J.H. were in the French Polynesian islands. My subsequent investigation identified fraudulent credit card transactions during the period HARRIOTT and Arielle HARRIOTT were in the same geographic area and that were directly attributable to HARRIOTT and Arielle HARRIOTT.

29. Specifically, bank records show that on October 16 and 18, 2020, the Citibank credit card ending in X8311 was fraudulently

17

charged for $7,463.57 at Conrad Bora Bora. Then, on October 17, 2020, Citibank credit card X5957 was fraudulently charged for $6,569.80 at Conrad Bora Bora. Conrad Bora Bora is luxury Polynesian resort. A subsequent review of the supporting records revealed that both transactions were reported by the card holders as fraud. Citibank's subsequent investigation also determined that the transactions were fraudulent and the victim was not held liable. Ultimately, Citibank incurred a complete loss on the amount. A review of the records revealed that the two purchases were for three rooms at Conrad Bora Bora in the guest's name "Patrick Jesse Harriott". At this time, Citibank's internal investigation has been unable to get any additional information; however, based on my training, experience, and investigation to date, I believe that HARRIOTT, Arielle HARRIOTT, and J.H. were directly responsible for the fraudulent transactions.

30. Another example was on or about September 27, 2022[2], when airline records showed the following. DINH departed Vienna departed Vienna International Airport (VIE) via flight 128 to Dubai International Airport (DXB). The following day, on September 28, 2022, HARRIOTT, Arielle HARRIOTT, and J.H. (i.e., HARRIOTT's juvenile son) departed LAX on flight EK216 to DXB. Several days later, on October 7, 2022, DINH departed DXB via flight 127 to VIE and HARRIOTT, Arielle HARRIOTT, and J.H. departed DXB on flight EK215 to

---

[2] The investigation revealed that HARRIOTT and Arielle HARRIOTT, also fraudulently purchased first class tickets from LAX to London Heathrow International Airport (LHR) on September 27, 2022 via Virgin Airlines flight VS24 using JP Morgan Chase credit card x2011. The purchase was more than $6,800; however, for unknown reasons, HARRIOTT and Arielle HARRIOTT did not travel on the fraudulently purchased tickets and subsequently traveled to Dubai, UAE the following day on September 28, 2022. JP Morgan Chase's internal investigation confirmed that the names and other identifying information on the airline tickets were HARRIOTT and Arielle HARRIOTT.

18

LAX. As detailed below, Arielle HARRIOTT's and J.H.'s tickets were fraudulently purchased. At this time, it is unknown how HARRIOTT and DINH's airline tickets were paid for; however, based on my training, experience, and investigation to date I believe that the airline tickets were likely fraudulently purchased. Thus, between September 28 – October 7, 2022, DINH, HARRIOTT, Arielle HARRIOTT, and J.H. were in Dubai, UAE simultaneously. My subsequent investigation identified fraudulent credit card transactions during the period HARRIOTT, DINH, and others were in the same geographic area and that were directly attributable to HARRIOTT, Arielle HARRIOTT, DINH, and others totaling more than $25,000.

31. Bank records show that on September 28, 2022, the JP Morgan Chase credit card ending in X0937 was fraudulently charged for $5,970, $130, and $195 by Emirates Airlines. Additionally, another purchase in the of $5,970 was declined. A subsequent review of JP Morgan Chase's internal investigation records revealed that two first-class tickets were purchased for Arielle HARRIOTT and J.H. from LAX to DXB for flight EK216, as detailed above. At this time, it is unknown how or where HARRIOTT, Arielle HARRIOTT, and J.H. stayed in Dubai; however, based on my training, experience, and investigation to date, I believe that HARRIOTT's accommodations were likely fraudulently purchased. Then, on October 6, 2022, Citibank credit card X4304 had an attempted transaction for $5,310.03 at Jumeirah Burj Al Arab in Dubai, UAE, which was declined. Jumeirah Burj Al Arab is an "ultra-luxury" 5-star hotel in Dubai, UAE. The following day, on October 7, 2022, the same credit card (i.e., Citibank credit card X4304) was charged $8,622.55 at Jumeirah Burj Al Arab. A subsequent

review of the supporting records revealed that both transactions were reported by the card holders as fraud (i.e., Arielle HARRIOTT and J.H.'s airline tickets and DINH's hotel purchases). Citibank's subsequent investigation also determined that the transactions were fraudulent and the victim was not held liable. Citibank conducted their own independent internal investigation, which included obtaining business records from Jumeirah Burj Al Arab. In summary, a review of the documents obtained verified DINH as the occupant and user of the credit card. Specifically, the hotel made a copy of DINH's Austrian passport and collected other personal identifying information, including her full name, date of birth, phone number, address, etc. I have also reviewed the immigration records from Emirati authorities, which confirmed DINH entered and departed Dubai, UAE, as detailed above. Ultimately, Citibank incurred a complete loss on the approved amount.

32.   Another example occurred over the span of several weeks between approximately June 15 – July 20, 2023, and included multiple countries, including the United States, France, Greece, and Austria. In total, I identified approximately $100,000 in fraudulent credit card transactions for airfare, luxury hotel accommodations, room service, hotel spa services, fine dining, and lavish shopping directly attributable to HARRIOTT, Arielle HARRIOTT, DINH, and other co-conspirators through business records. Specifically, on or about June 15, 2023, DINH and co-conspirator Ayra SHEIKH, an Austrian citizen, entered the United States at LAX via flight A72 from Charles de Gaulle International Airport (CDG) in Paris, France.[3] A couple

---

[3] Currently, the Intra-Schengen travel (i.e., within the European Union) of DINH and SHEIKH is unknown to me. Despite this, I

days later, on June 17, 2025, a co-conspirator identified as Bettina STRASSER, an Austrian and South African citizen, entered the United States via an international flight from Cape Town International Airport (CPT) to LAX, according to customs records. Several days later, on June 26, 2023, SHEIKH and STRASSER departed LAX via flight via flight AY2 to VIE. The following day, on June 27, 2023, DINH departed LAX via flight KL604 to VIE. At this time, it is unknown why DINH departed a day apart from SHEIKH and STRASSER; however, I believe it was likely for DINH to stay an additional day in the greater Los Angeles, CA area. As detailed below, DINH, SHEIKH, and STRASSER's departure airline tickets from LAX to VIE were fraudulently purchased. At this time, it is unknown how DINH, SHEIKH, and STRASSER's arrival airline tickets were paid for; however, based on my training, experience, and investigation to date I believe that the arrival airline tickets were likely fraudulently purchased. Thus, DINH, SHEIKH, STRASSER, HARRIOTT, and other co-conspirators were in the United States between at least June 17 - 26, 2023. I have confirmed HARRIOTT was physically present in the United States by a review of border crossing records, which showed HARRIOTT's last entry into the United States was on October 22, 2022, from DXB to LAX and HARRIOTT departing the United States via LAX to Jamaica on June 26, 2023, as detailed below.[4] Thus, HARRIOTT was physically present in

---

believe that DINH and SHEIKH likely traveled from VIE to CDG, and subsequently contemporaneously traveled to the United States.

[4] A review of border crossing records revealed that HARRIOTT, Arielle HARRIOTT, and J.H. traveled to and from LAX to Sangster International Airport (MBJ) in Montego Bay, Jamica between June 26 – 30, 2023. At this time, it is unknown how the flights were paid for or where HARRIOTT, Arielle HARRIOTT, and J.H. stayed in Jamaica; however, based on my training, experience, and investigation to date, I believe that the airline tickets to and from Jamaica and the

1    the United States between October 22, 2022 to June 26, 2023. My

2    subsequent investigation identified fraudulent credit card

3    transactions during the period to DINH, SHEIKH, STRASSER, HARRIOTT

4    and other co-conspirators that were in the same geographic areas and

5    that were directly attributable to HARRIOTT, DINH, and others.

6         33.  Bank records show that between June 15 – June 25, 2023, the

7    JP Morgan Chase credit card ending in X2890 was fraudulently charged

8    (62) separate transactions totaling more than $13,000 in several

9    states, including California, Nevada, and New York. The charges were

10   for hotel accommodation (i.e., more than $5,200 at BDC reservations),

11   restaurants, luxury shopping (i.e., $1,400 at Louis Vuitton and

12   $2,023 at Chanel Crystals) and various miscellaneous expenses. I have

13   conducted an analysis of the transactions and determined several

14   things. First, all the transactions occurred in temporal proximity of

15   DINH arriving and during the time DINH and other co-conspirators were

16   physically present in the United States. Second, it appeared that

17   DINH and other co-conspirators predominantly stayed in the greater

18   Los Angeles, California area; however, there appeared to be two short

19   day / overnight trips to Las Vegas, Nevada, and New York, New York.

20   Third, the BDC reservations were directly attributable to DINH and

21   HARRIOTT. At this time, the domestic flight records are not

22   available; however, based on my training, experience, and

23   investigation to date, I believe that DINH and likely other co-

24   conspirators took short trips from to Las Vegas, Nevada and New York,

25   New York. A subsequent review of the supporting records revealed that

26   all the transactions were reported by the card holder as fraud. JP

27   _____

28   related hotel accommodations in Jamaica were likely fraudulently
     purchased.

Morgan Chase's subsequent investigation also determined that the transactions were fraudulent and the victim was not held liable. Ultimately, JP Morgan Chase incurred a complete loss on the amount. A review of the several of the BDC reservation records revealed that the guests' names were "Jessee Harriott" and "Kim Dinh". I note that the name "Jesse Harriott" is consistent with HARRIOTT's middle name (i.e., Jesee) and last name (i.e., HARRIOTT). At this time, JP Morgan Chase's internal investigation has been unable to get any additional information; however, based on my training, experience, and investigation to date, I believe that HARRIOTT, DINH, and other co-conspirators were directly responsible for the fraudulent transactions.

34.    Border crossing and bank records show that SHEIKH, STRASSER, and DINH subsequently departed LAX to VIE on June 26 and 27, 2023, respectively. On June 26, 2023, JP Morgan Chase credit card X7161 was charged $1,908.90 and $1,908.90 by Finnair and $7,082.60 by Air France on June 27, 2023, or totaling more than $10,900. I noted that the transactions occurred in temporal proximity to SHEIKH, STRASSER, and DINH departing the United States and were transactions processed by airline companies. A subsequent review of the supporting records revealed that the transactions were reported by the card holder as fraud. JP Morgan Chase's subsequent investigation also determined that the transactions were fraudulent and the victim was not held liable. JP Morgan Chase conducted their own independent internal investigation, which included obtaining business records from Finnair and Air France. In summary, a review of the documents obtained verified that the purchases were for airline tickets,

23

including business class one-way tickets from LAX to VIE for SHEIKH and STRASSER on June 26, 2023, and a first-class one-way ticket for DINH from LAX to VIE on June 27, 2023, referencing passenger ticket numbers 1052478128121, 1052478128120, and 0572302182386, respectively. I have also reviewed the border crossing records, which confirmed that SHEIKH, STRASSER, and DINH departed LAX on the fraudulently purchased airline tickets. Ultimately, JP Morgan Chase incurred a complete loss on the approved amount.

35.  On or about July 3, 2023, HARRIOTT and Arielle HARRIOTT were listed on a flight manifest departing the United States from LAX via flight A72 to CDG in Paris, France. A review of the records showed that HARRIOTT and Arielle HARRIOTT were listed as "no board"; however, I believe that HARRIOTT and Arielle HARRIOTT were on the plane and the "no board" was an error for unknown reasons. As detailed below, HARRIOTT and Arielle HARRIOTT entered the United States several weeks later, on July 21, 2023, via flight AA137 from LHR to LAX. There were no additional entries and/or exits between July 3 – July 21, 2023. Thus, HARRIOTT and Arielle HARRIOTT had to have departed the United States on or about July 3, 2023, to have reentered the United States several weeks later from LHR on July 21, 2023. There were no other flight or travel records that had HARRIOTT and Arielle HARRIOTT departing the United States. Thus, I believe the "no board" on July 3, 2023, was in error and HARRIOTT and Arielle HARRIOTT traveled from LAX to CDG and were physically present in the Intra-Schengen during the relevant period, as detailed below.

36.  As detailed above, DINH and other co-conspirators departed LAX to VIE on June 27, 2023. Thus, DINH was likely physically present

in the Intra-Schengen in the European Union. Then, between July 1 – 22, 2023, four JP Morgan Chase credit cards and two Citibank credit cards were fraudulently used in France, Monaco, Greece, and Austria. A review of the fraudulent transactions revealed that the travel occurred in chronological order consistent with HARRIOTT, Arielle HARRIOTT, and DINH likely traveling in several areas in Europe. At this time, I do not know the exact travel dates to each country; however, it appeared that Paris, France was the primary location with likely short duration trips (i.e., day trips and/or overnight trips) to Monaco and Greece. The cards were identified as JP Morgan Chase credit cards X4745, X3501, X4773, and X3911 and the Citibank credit cards X3664 and X7447. As detailed herein, this was the same period I have identified HARRIOTT, Arielle HARRIOTT, DINH, and likely other co-conspirators traveling to and being physically present in the same geographic areas. A subsequent review of the supporting records revealed that all the transactions were reported by the card holders as fraud. JP Morgan Chase and Citibank's subsequent investigations also determined that the transactions were fraudulent and the victims were not held liable. Additionally, the internal investigations completed by JP Morgan Chase and Citibank have directly attributed the fraudulent use of the cards to HARRIOTT, Arielle HARRIOTT, DINH, and other co-conspirators. I have conducted an analysis of the transactions and determined several things. First, all the transactions occurred in temporal proximity of HARRIOTT arriving at CDG and during the time I believe that DINH and other co-conspirators were physically present in France. Second, the fraudulent use of this card was in temporal proximity to the fraudulent use of several other

credit cards attributable to HARRIOTT, Arielle HARRIOTT, DINH, and others. Third, the fraudulent use of the credit card was consistent with the modus operandi of my investigation. Thus, I believe that HARRIOTT, Arielle HARRIOTT, DINH, and likely other co-conspirators were physically present in France and in the European Union between approximately July 1 – 22, 2023, and used the various credit cards to lavishly travel, purchase luxury goods, eat at fine restaurants, receive spa treatments, and various other expenditures.

37.    For example, bank records show that JP Morgan Chase credit card X4745 was fraudulently charged (24) separate transactions totaling more than $12,500 in several countries, including France and Monaco. The charges were for hotel accommodation (i.e., luxury hotels in Paris, France, and more than $2,000 in BDC reservation), restaurants (i.e., more than $1,700 at 5-star restaurant La Petite Masion in Monaco), luxury shopping (i.e., $2,100 at Louis Vuitton in Paris, $1,800 at Roberto Cavalli Cannes, and more than $3,000 at other various high-end designer stores in Paris) and various miscellaneous expenses. JP Morgan Chase conducted their own independent investigation and obtained business records from BDC. A review of the BDC reservation records revealed that the guests' name was "Kim Dinh". At this time, JP Morgan Chase's internal investigation has been unable to get any additional information; however, based on my training, experience, and investigation to date, I believe that HARRIOTT, Arielle HARRIOTT, DINH, and other co-conspirators were directly responsible for the fraudulent transactions.

38.  Another example was on July 6, 2023, when bank records show that Citibank credit card X3664 was charged $7,655.20 by Prince de Galles Hotel, Paris, France. Prince de Galles Hotel is a luxury hotel in Paris, France. Citibank conducted their own independent investigation and obtained business records from Prince de Galles Hotel. A subsequent review of the supporting records revealed that the charge of $7,655.20 was for two separate room accommodations between July 6 – 8, 2023, and for other various expenses, including spa treatments (massages, facials, etc.), dining and gratuity, room service, and dry cleaning. Both rooms were listed under HARRIOTT and Arielle HARRIOTT. A photocopy of HARRIOTT and Arielle HARRIOTT's US passports were copied by the hotel at time of check-in. I have reviewed the two images and have determined them to be authentic and the passports that HARRIOTT and Arielle HARRIOTT used to travel from LAX to CDG. Thus, HARRIOTT and Arielle HARRIOTT were confirmed. I noted that there were two rooms rented. Based on my training, experience, and investigation to date, I believe that one of the two rooms rented was likely occupied by DINH and that HARRIOTT and Arielle HARRIOTT stayed in the other.

39.  Another example was bank records show that JP Morgan Chase credit card X3501 was fraudulently charged (11) separate transactions totaling more than $14,000 between July 7-10, 2023, in France. The charges were for hotel accommodation (i.e., multiple BDC reservations), restaurants, luxury shopping (i.e., at Printemps Hassmann) and various miscellaneous expenses. Printemps Haussmann is Paris's iconic, historic flagship department store on Boulevard Haussmann, famous for luxury fashion, beauty, home goods, and a

stunning Art Nouveau dome. JP Morgan Chase conducted their own independent investigation and obtained business records from BDC. A review of the BDC reservation records revealed that the guests' name was "Kim Dinh". At this time, JP Morgan Chase's internal investigation has been unable to get any additional information; however, based on my training, experience, and investigation to date, I believe that HARRIOTT, Arielle HARRIOTT, DINH, and other co-conspirators were directly responsible for the fraudulent transactions.

40.   Another example was bank records show that JP Morgan Chase credit card X4773 was fraudulently charged (55) separate transactions totaling more than $26,000 between July 8-25, 2023, in several countries, including Paris, France (between approximately July 8-11, 2023), Mykonos, Greece (between approximately July 18-20, 2023), and Vienna, Austria (between approximately July 21-25, 2025). The charges were for hotel accommodation (i.e., multiple BDC reservations), fine dining restaurants, luxury shopping (i.e., at Printemps Hassmann, Louis Vuitton, Chanel, Dior, etc.) and various miscellaneous expenses. JP Morgan Chase conducted their own independent investigation and obtained business records from BDC and at least one retail clothing store, which was for the purchase of €1500 for a men's designer t-shirt and a men's pair of denim pants. Thus, I believe the pants were likely for HARRIOTT and not DINH. I also noted that the purchases in Vienna, Austria between approximately July 21 – 25, 2023, were in the geographic region of where DINH resides. Thus, I believe that DINH continued to use the credit card after returning home to Vienna, Austria from Greece. A review of the BDC reservation

28

1    records revealed that the guests' name was "Kim Dinh". At this time,

2    JP Morgan Chase's internal investigation has been unable to get any

3    additional information; however, based on my training, experience,

4    and investigation to date, I believe that HARRIOTT, Arielle HARRIOTT,

5    DINH, and other co-conspirators were directly responsible for the

6    fraudulent transactions.

7        41.   Another example was bank records show that JP Morgan Chase

8    credit card X3911 was fraudulently charged multiple transactions

9    totaling more than $8,000 between July 11 - 20, 2023, in France. The

10   charges were for hotel accommodation (i.e., multiple BDC

11   reservations) and taxi services, among others. JP Morgan Chase

12   conducted their own independent investigation and obtained business

13   records from BDC. A review of the BDC reservation records revealed

14   that the guests' name was "Kim Dinh". At this time, JP Morgan Chase's

15   internal investigation has been unable to get any additional

16   information; however, based on my training, experience, and

17   investigation to date, I believe that HARRIOTT, Arielle HARRIOTT,

18   DINH, and other co-conspirators were directly responsible for the

19   fraudulent transactions.

20       42.   Another example was on July 20, 2023, bank records show

21   that Citibank credit card X7447 was charged $7,416.60 by American

22   Airlines. A subsequent review of the supporting records revealed that

23   the transactions were reported by the card holder as fraud.

24   Citibank's subsequent investigation also determined that the

25   transactions were fraudulent and the victim was not held liable.

26   Citibank conducted their own independent internal investigation,

27   which included obtaining business records American Airlines. In

28

summary, a review of the documents obtained verified that the
purchase was for first-class airline ticket for Arielle HARRIOTT from
Athinai International Airport (ATH) in Greece, to LAX, via LHR, on
flight AA137. As detailed above, the fraudulent credit card usage
occurred in France and Greece. A subsequent review of border crossing
records revealed that Arielle HARRIOTT and Patrick HARRIOTT traveled
together on the same flight originating from ATH, via LHR, to LAX.
The flight arrived on July 22, 2025, at approximately 5:30 p.m. At
this time, it is unknown how HARRIOTT paid for his airfare; however,
based on my training, experience, and investigation to date, I
believe that HARRIOTT likely also fraudulently purchased his airline
ticket and that it was not reported to authorities.

43.   Another example occurred over the span of several days
between approximately December 31, 2023, to January 10, 2024. In
summary, the investigation revealed that HARRIOTT, Arielle HARRIOTT,
and J.H. traveled from LAX to DUB and rendezvoused with DINH and
another known co-conspirator, who traveled from VIE to DUB. I have
reviewed border crossing records which confirmed that HARRIOTT,
Arielle HARRIOTT, and J.H. exited and entered the United States via
flights to / from Dubai, UAE. During this relevant period, multiple
credit cards were used fraudulently in to purchase airline tickets to
and from LAX and DUB and to pay for hotel accommodations, spa
services, and various other expenditures in Dubai, UAE. In total, the
fraudulent credit card transactions directly attributable to
HARRIOTT, Arielle HARRIOTT, DINH, and another known co-conspirator
were more than $63,000, according to bank records. The cards were
identified as Citibank credit cards X8513, X4911, X3537, X3226, and

X7948 and JP Morgan Chase credit card X7574. As detailed herein, this was the same period I have identified HARRIOTT, Arielle HARRIOTT, DINH, and likely other known co-conspirators traveling to and being physically present in the same geographic areas. A subsequent review of the supporting records revealed that all the transactions were reported by the card holders as fraud. JP Morgan Chase and Citibank's subsequent investigations also determined that the transactions were fraudulent and the victims were not held liable. Additionally, the internal investigations completed by JP Morgan Chase and Citibank have directly attributed the fraudulent use of the cards to HARRIOTT, Arielle HARRIOTT, DINH, and other known co-conspirators. I have conducted an analysis of the transactions and determined several things. First, all the transactions occurred in temporal proximity of HARRIOTT, Arielle HARRIOTT, and J.H. traveling to and from Dubai, UAE, and during the time I believe that DINH and other co-conspirators were physically present in Dubai, UAE. Second, the fraudulent use of this card was in temporal proximity to the fraudulent use of several other credit cards attributable to HARRIOTT, Arielle HARRIOTT, DINH, and others. Third, the fraudulent use of the credit card was consistent with the modus operandi of my investigation. Citibank and JP Morgan Chase conducted their own independent investigation and obtained business records, including airline ticket information and hotel records. A subsequent review of these records identified HARRIOTT, Arielle HARRIOTT, and DINH as being directly attributable to the fraudulent credit card transactions. The records included scanned images of HARRIOTT, Arielle HARRIOTT, and DINH's valid passports, which were captured at

the hotels and other accommodations. I have reviewed the passport images and have determined them to be authentic and the passports that HARRIOTT, Arielle HARRIOTT, and DINH and the same passports that HARRIOTT and Arielle HARRIOTT used to travel from LAX to DUB and the passport DINH previously used to travel to the United States. Thus, HARRIOTT, Arielle HARRIOTT, and DINH were confirmed. Thus, I believe that HARRIOTT, Arielle HARRIOTT, DINH, and likely other known co-conspirators were physically present in Dubai, UAE, between December 31, 2023, to January 10, 2024, and used the various credit cards to lavishly travel, purchase luxury goods, eat at fine restaurants, receive spa treatments, and various other expenditures totaling more than $63,000.

## V.   **VEHICLE LOAN FRAUD EXAMPLES**

44.   As detailed herein, my investigation also revealed that HARRIOTT was directly involved in identity theft and loan fraud concurrently with the credit card fraud scheme using hybrid synthetic identity theft. For example, HARRIOTT would apply for vehicle loans using his real identifying information (i.e., name, date of birth, driver's license number, address, phone number, email address, etc.) and a fraudulently obtained SSN (i.e., a victim's SSN) for luxury vehicles.

45.   To date, the investigation has identified at least 12 loan applications at various luxury dealerships between at least September 1, 2020, to January 6, 2025, in the greater Los Angeles, California area. In total, HARRIOTT applied for financing for more than $2.5 million in vehicle loans fraudulently, which included successfully obtaining at least nine luxury vehicles based on fraudulently

submitted loan applications. HARRIOTT also paid more than $262,000 in cash, cashier's checks, and domestic wires as part of the transactions to secure the vehicles. The money was paid as deposits and to have more favorable lease options. The source of the payments is currently unknown; however, based on my training, experience, and investigation to date, I believe that the funds were likely obtained as part of an unknown unrelated criminal scheme and/or the Target Offenses. As part of my investigation into HARRIOTT's loan application fraud and the use of Victim 1's SSN, I have reviewed business and banking records, spoken with employees at multiple dealerships and financing offices, reviewed dozens of pages of loan applications, and interviewed Victim 1, among other things. My review of several of the loan applications also revealed that HARRIOTT provided altered and fraudulent bank statements to increase his monthly income and net worth. According to the records, HARRIOTT provided HARRIOTT's Phone 1 as his primary phone number on eleven vehicle loan applications, HARRIOTT's Phone 2 as a secondary phone number on three vehicle loan applications, HARRIOTT's Apple Account 1 as his primary email address on ten vehicle loan applications, and HARRIOTT's Apple Account 2 as his primary email address on one vehicle loan application.

46.  For example, in August 2021, according to records HARRIOTT completed a vehicle loan application for a 2020 Lamborghini Urus VIN ZPBUA1ZL5LLA09869 from Westlake Coach Company LLC and Midway Leasing, referencing Sale Agreement No 102631 and Lease Agreement No 5460. The vehicle was valued at $184,815. The vehicle loan application included HARRIOTT's, date of birth, current address (at the time), phone

number (i.e., HARRIOTT's Phone 1 and HARRIOTT's Phone 2)), email
address (i.e., HARRIOTT's Apple Account 1"), and a victim's SSN XXX-
XX-6148. Record checks have confirmed that HARRIOTT's issued SSN was
XXX-XX-2761. HARRIOTT also signed an approval form from Midway
Leasing authorizing the company to run HARRIOTT's credit, which was
run by Midway Leasing based on the biographical information provided
by HARRIOTT. Ultimately, HARRIOTT's vehicle loan application was
approved based on the credit report, purported monthly income, and
purported bank statements.

47.  Also, as part of the vehicle loan application HARRIOTT
provided bank statements to prove his financial solvency. A review of
the record provided by HARRIOTT included three months "Savings"
account bank statements from Citibank bank account ending in X1158,
including June, July, and August 2021. The records appeared to be a
monthly summary of beginning balance, ending balance, and deposits
and withdrawals. Notably, HARRIOTT's Citibank statements provided
included what appeared an average balance of more than $750,000 and
multiple deposits, including a monthly $50,000 deposit from "HARR
Trust" and other deposits from "UXY10-Forex EX" and "NADEX
TE132884010. I have served Citibank with a subpoena, spoken with an
authorized Citibank representative, and reviewed the bank records. In
summary, my investigation revealed that the bank statements provided
by HARRIOTT are fraudulent, including the account balance and monthly
deposits; however, the Citibank account number ending in X1158 was
assigned to an account owned by HARRIOTT. The actual Citibank account
statement showed a beginning and ending balance of $0.06 with no

1  deposits for the same periods as the fraudulently submitted bank
2  statements for June, July, and August 2021.

3      48.   Another example was on June 9, 2023. HARRIOTT applied for a
4  vehicle loan from Porsche Financial Services for two vehicles,
5  identified as a 2023 Porsche Cayenne VIN WP1AA2AY3PDA10329 and a 2022
6  Porsche 911 VIN W0AC2A92NS270587, valued at $91,949 and $278,000,
7  respectively. According to records, HARRIOTT submitted a vehicle loan
8  application for both vehicles. The online vehicle loan application
9  included HARRIOTT's full name, date of birth, driver's license
10 number, phone number (i.e., HARRIOTT's Phone 1), email address (i.e.,
11 HARRIOTT's Apple Account 1), and a social security number. HARRIOTT
12 provided Victim 1's SSN on the credit application, identified as XXX-
13 XX-6281. Record checks have confirmed that HARRIOTT's issued SSN was
14 XXX-XX-2761. HARRIOTT also purported to be self-employed at AP LUXURY
15 COLLECTIONS LLC with a claimed monthly salary of $20,000 and an
16 additional monthly income of $50,000 from a "Family Trust Account".
17 As detailed above, my investigation revealed that the purported
18 $50,000 month trust deposit was fictitious. Porsche Financial
19 Services submitted a request to the credit bureau for HARRIOTT's
20 application, which included Victim 1's SSN. Ultimately, Porsche
21 Financial Services approved HARRIOTT's vehicle loan application and
22 completed lease agreements for the two vehicles. The credit
23 application and subsequent lease agreements were approved based on
24 the credit report, which included using Victim 1's SSN, and
25 HARRIOTT's purported income, which was fraudulent. Additionally,
26 HARRIOTT had previously leased at least one additional vehicle from
27 Porsche Financial Services, which included the use of the same Victim
28

1's SSN and other biographical information. The 2023 Porsche Cayenne was leased by HARRIOTT for 39 months with a monthly lease payment of $1,598.55 and the 2022 Porsche 911 was leased for 60 months with a monthly lease payment of $5,295.18. HARRIOTT also received approximately $23,000 in equity for turning in two previously leased vehicles that were also fraudulently obtained, which included a 2021 Mercedes-Benz S580 and a 2022 Porsche Taycan. The equity in the two-vehicle trade-in was earned because HARRIOTT had paid approximately $50,000 as a down payment when the two vehicles were originally leased. The source of the $50,000 deposit is unknown. The 2023 Porsche Cayenne was subsequently used as part of a "trade-in" deal to obtain a 2024 Lamborghini Urus in January 2025, as detailed below.

49.    Another example was on January 6, 2025, HARRIOTT applied for a vehicle loan from O'Gara Coach Company, LLC DBA Rolls Royce of Beverly ("O'Gara Coach Company") for a 2024 Lamborghini Urus VIN ZPBUC3ZL2RLA34260, which was valued at $319,522. According to business records, HARRIOTT submitted an in-person credit application, which included HARRIOTT's full name, address, date of birth, driver's license number, phone number, and social security number. HARRIOTT provided Victim 1's SSN on the credit application, identified as XXX-XX-6281. Record checks have confirmed that HARRIOTT's issued SSN was XXX-XX-2761. HARRIOTT provided the **SUBJECT PREMISES** as his residence, HARRIOTT's Phones as his phone numbers, and HARRIOTT's Apple Account 1 as his email address on the final "Contract Agreement" and various other documents as part of the loan transaction, including paperwork that was submitted to the California Department of Motor Vehicles (CA-DMV). Additionally, HARRIOTT provided a SoCalGas utility invoice

for the **SUBJECT PREMISES** for December 2025. HARRIOTT also purported to be self-employed at AP LUXURY COLLECTIONS LLC with a monthly salary of $20,000 and an additional monthly income of $50,000 from a "Family Trust Account". As detailed above, my investigation revealed that the purported $50,000 month trust deposit was fictitious. O'Gara Coach Company submitted a request to the credit bureau for HARRIOTT's application, which included Victim 1's SSN. Ultimately, O'Gara Coach Company approved HARRIOTT's vehicle loan application and completed the lease agreement for the vehicle. HARRIOTT also traded in two previously leased vehicles (i.e., a 2023 Porsche Cayenne and a 2022 Porsche 911) and paid $50,000, which included a $40,000 cashier's check and $10,000 cash. The 2024 Lamborghini Urus was leased by HARRIOTT for 60 months with a monthly lease payment of $1,598.55 and the 2022 Porsche 911 was leased for 39 months with a monthly lease payment of $3,800.68. As detailed herein, in February 2025, I coordinated with O'Gara Coach Company's legal department and successfully recovered the 2024 Lamborghini Urus that was fraudulently obtained. The vehicle was recovered after HARRIOTT brought the vehicle into the dealership for service. Although the vehicle was recovered, O'Gara Coach Company still sustained a significant loss due to depreciation and damage done to the vehicle by HARRIOTT. HARRIOTT was subsequently notified by the vehicle dealership that his previous loan applications were identified as fraudulent and that HARRIOTT was no longer allowed on the property.

VI.  **IDENTIFICATION OF HARRIOTT AND DINH RE: MARIJUANA PARCELS**

50.  On about November 7, 2025, I was contacted by Austrian authorities regarding the seizure of approximately 2.36 kilograms of

marijuana concealed in a mail parcel originating from Los Angeles, California, destined to Vienna, Austria shipped via the United States Postal Service (USPS), referencing USPS Tracking Number CH242030746US ("Drug Parcel 1"). The parcel was shipped on October 24, 2025, at 1:22 p.m. PST. The parcel was subsequently interdicted by Austrian authorities on or about November 4, 2025, after a search was conducted pursuant to Austrian customs laws. Shortly thereafter, the Austrian authorities requested assistance from HSI Vienna and I initiated my investigation, which included requesting assistance from United States Postal Inspection Service (USPIS).

51. As detailed herein, the sender of Drug Parcel 1 was identified as HARRIOTT and the likely intended recipient was DINH, although the names on the package were fictitious. HARRIOTT was identified as the sender in several ways, as explained below, including CCTV footage, rental car information obtained pursuant to an administrative subpoena, and other parcels linked via the same credit card and IP address activity. DINH was identified as the likely intended recipient based off IP address queries of the drug-laden parcel and my ongoing investigation into the relationship between HARRIOTT and DINH. My investigation also identified at least eight other parcels shipped by HARRIOTT to DINH between September – November 2025, including another parcel that was indicted by U.S. Customs and Border Protection (CBP) containing 1.86 kilograms of marijuana, referencing USPS Tracking Number CH242552892US ("Drug Parcel 2" and collectively referred to as the "Drug Parcels"). The content of the other parcels identified likely shipped by HARRIOTT to DINH is currently unknown; however, based on my training, experience,

and investigation to date I believe that they also likely contained approximately 2 kilograms of marijuana per parcel, or more than 10 kilograms of marijuana.

52.   In summary, the investigation revealed that the Drug Parcels were mailed with fictitious sender and recipient information. Despite this, my investigation positively identified HARRIOTT as the sender and DINH as the likely intended recipient, which included CCTV footage that captured an individual I identified by sight as HARRIOTT mailing the parcels from Los Angeles, California, on October 24 and November 4, 2025.

53.   USPIS obtained the CCTV footage and still frames from the USPS located at 1808 W 7th Street, Los Angeles, CA 90057 (i.e., the location where Drug Parcel 1 was shipped from). The footage included multiple camera angles, including inside the USPS location and outside. In summary, the footage depicted an African American male walk into the store carrying a brown box and what appeared to be a customs declaration form, identified as HARRIOTT as detailed herein. For ease of reference, the individual will be referred to as HARRIOTT.

54.   HARRIOTT was wearing a gray hooded sweatshirt with a front logo bearing the word "CALIFORNIA", dark colored sweatpants, and athletic shoes. HARRIOTT was also carrying a black shoulder bag and was wearing Air pods. HARRIOTT presented the brown box and the prefilled Customs declaration to the cashier and subsequently paid using a cellular phone. The payment was identified as AMEX CREDIT X8600. As detailed herein, I obtained records from Uber and UberEATS as part of my investigation. A review of the records revealed that

HARRIOTT used the same card ending in X8600 for 19 Uber and UberEATS purchases between October 27 – December 27, 2025, which included multiple services to the **SUBJECT PREMISES**. Thus, HARRIOTT was also confirmed as the card holder used to make the payment for the marijuana-laden parcel.

55.    The CCTV footage also identified HARRIOTT's vehicle as a 2025 Jeep Wrangler bearing Utah license plate H451JH ("HARRIOTT's Rental Jeep"). Subsequent record checks revealed that the Jeep Wrangler was a Hertz rental car. As detailed below, a review of records obtained via an administrative subpoena revealed that HARRIOTT was the renter of the Jeep Wrangler. An image of HARRIOTT shipping Drug Parcel 1 and HARRIOTT's Rental Jeep looked like this:

 

56.    USPIS also provided IP address tracking activity for Drug Parcels. A subsequent analysis of the IP address activity identified several IP address queries, including IP addresses by California and Austrian based cellular phones and the residential Austrian-based IP address of 82.218.71.117, later identified as DINH's IP Address. The

IP address 82.218.71.117 queried Drug Parcel 1 (67) times between October 25 – November 6, 2025, and Drug Parcel 2 (63) times between November 5-14, 2025. Subsequent open-source queries on IP2 website revealed that the IP address resolved to the Austrian based internet service provider Kabelplus and was a residential internet connection.

57.   I then served an administrative subpoena to Hertz Rental Corporation requesting the rental records for HARRIOTT's Rental Jeep. Later, I also served a second subpoena to Hertz Rental Corporation requesting rental records for customer account information and all rental vehicles for HARRRIOTT in 2025. A subsequent review of the records revealed that HARRIOTT rented the vehicle between October 22 – 25, 2025, which included when Drug Parcel 1 was mailed on October 24, 2025. Hertz collected HARRIOTT's biographical information, including HARRIOTT's full name, date of birth, address, and other identifying information and a copy of HARRIOTT's California driver's license. According to Hertz's records, HARRIOTT's phone number was listed as HARRIOTT's Phone 2 and HARRIOTT's email address was HARRIOTT's Apple Account 2.

58.   The subsequent investigation revealed that the IP address 82.218.71.117 was directly attributable to DINH. Specifically, the IP address was captured by Department of State as the *same* IP address captured when DINH applied for a United States nonimmigrant visa application November 9, 2023. I have also learned that the Austrian authorities conducted their own independent investigation into the IP address. In summary, the Austrian authorities obtained court authorized business records which confirmed the IP Address 82.218.71.117 was attributable to DINH and DINH's residence in the

41

greater Vienna, Austria area. Thus, the IP address is directly attributable to DINH and subsequently attributable to querying the status of the Drug Parcels. Based on my training and experience, I believe that DINH was querying the Drug Parcels to get real-time information on the status and location of the Drug Parcels shipped by HARRIOTT to DINH.

## VII. **HARRIOT'S COMPLICATED AND OPAQUE FINANCES INCLUDE HUNDREDS OF THOUSANDS IN UNEXPLAINED CASH DEPOSITS**

59. The Uber and UberEATS records I reviewed for HARRIOTT's accounts included the last 4-digits of all the credit / debit cards that were used for services between January 9, 2025, to January 2, 2026. A subsequent analysis identified 31 unique card numbers used for payments linked to HARRIOTT's Uber and UberEATS accounts.

60. My investigation has identified several bank accounts held solely by HARRIOTT, including a personal checking account and a business checking account in the name of AP LUXURY COLLECTIONS at JP Morgan Chase. I have reviewed more than 2,000 pages of bank statements and conducted a financial analysis. In summary, between approximately April 21, 2023, to January 30, 2025, HARRIOTT's two accounts received approximately 200 separate cash deposits totaling $465,000. I noted that *all* the cash deposits occurred at ATMs and were less than the $10,000 reporting requirement amount, with an average deposit of approximately $2,400. I also noted there were numerous times when HARRIOTT made multiple cash deposits at various ATMs in temporal proximity to each other that would have exceeded $10,000, i.e., structuring. At this time, the source of the cash deposits is unknown; however, based on my training, experience, and investigation to date, I believe the proceeds are likely from various

1  crimes HARRIOTT is directly and/or indirectly involved in, including

2  the SUBJECT OFFENSES.

3      61.  I subpoenaed from the California Franchise Tax Board the

4  tax records of HARRIOTT, ARIELLE, and HARRIOTT's business AP LUXURY.

5  After searching their records, the FTB stated in February of 2025

6  that they had no records responsive to the subpoena, indicating that

7  none of them filed taxes in California.  According to commercial

8  databases such as Accurint, HARRIOTT has resided in California since

9  at least December of 2018.  He claims to lenders to have incomes

10 ranging from $20,000 to $50,000 per month and lives in a rental that

11 does in fact cost $16,000 per month, so his income appears too high

12 to forgo filing taxes.  In my training and experience, many criminals

13 fail to pay tax on their illegal income and take steps to make it

14 hard for law enforcement to locate their assets.

15     62.  On December 3, 2025, HARRIOTT's Phone 1 exchanged four

16 phone calls with (XXX) XXX-5337, including one for almost an hour.

17 Subsequent record checks and open-source queries revealed that the

18 phone number was for Nathaniel Getzels, a licensed real estate agent

19 in California with the Getzels Group. Getzels Group is a real estate

20 company that specializes in real estate in the greater Los Angeles,

21 California area. Getzels Group company slogan is, "Luxury Real Estate

22 Los Angeles – Discovery Your Dream Home". A review of Getzels Group

23 publicly available website boasts a current and past real estate

24 portfolio with real estate for sale valued between $3.5 to $8 million

25 dollars, which includes property, residences, and vineyards.

26

27

28

1

VIII.    **IDENTIFICATION OF THE SUBJECT PREMISES**

2    63.   As detailed herein, I am investigating HARRIOTT and others

3    for the SUBJECT OFFENSES. My investigation has spanned approximately

4    24 months and has identified a sophisticated and complex fraud and

5    narcotics trafficking scheme perpetuated by HARRIOTT and other co-

6    conspirators. Over the span of several months, I have used numerous

7    investigative techniques to investigate HARRIOTT and others.

8    64.   Specifically, I have conducted a historical and proactive

9    investigation to identify the full scope of HARRIOTT's direct and

10   indirect involvement in the SUBJECT OFFENSES. In summary, my

11   investigation has revealed that HARRIOTT is a leader and organizer in

12   a Transnational Criminal Organization (TCO) that has successfully

13   committed the SUBJECT OFFENSES since at least 2019, including

14   previous arrests and convictions for similar conduct that predates my

15   investigation. An objective of my ongoing investigation was to

16   identify primary residence, potential stash locations, and vehicles

17   used by HARRIOTT. As detailed below, my investigation has identified

18   the **SUBJECT PREMISES** as HARRIOTT's primary residence since at least

19   October 2024 and HARRIOTT's Phones and HARRIOTT's Apple Accounts as

20   HARRIOTT's primary means of communication since at least 2019.

21   65.   In summary, I have verified HARRIOTT's residence as the

22   **SUBJECT PREMISES** several ways. First, on January 6, 2025, HARRIOTT

23   applied for a vehicle loan from O'Gara Coach Company for a 2024

24   Lamborghini Urus, as detailed herein. According to business records,

25   HARRIOTT submitted an in-person credit application and related CA-DMV

26   paperwork, which included HARRIOTT's full name and address as the

27   **SUBJECT PREMISES**. HARRIOTT purported he had lived at the **SUBJECT**

28

**PREMISES** for 6 months (i.e., since at least July 2025) and paid $16,000 per month in rent. I have corroborated HARRIOTT's monthly payment of $16,000 by reviewing HARRIOTT's bank records, which showed withdrawals in the amount of $16,000 in October, November and December 2024 and January 2025. HARRIOTT also provided a SoCalGas utility invoice for the **SUBJECT PREMISES** for January 2025, referencing SoCalGas account number XXXXXXXX738. The SoCalGas utility invoice was for utilities between November 19 – December 18, 2024, in the amount of $401.75 with a due date of January 10, 2025. I noted that the invoice also showed previous months utility usage, including in August, September, and October 2025. Thus, HARRIOTT had resided at the **SUBJECT PREMISES** for several months. Based on my training, experience, and investigation to date, I believe that HARRIOTT was required to show proof of address (i.e., a utility invoice) because the listed address on HARRIOTT's driver's license was not updated.

66.    Second, based on my training and experience, I know that it is common for individuals to use Uber and UberEATS for transportation and food deliveries, respectively. UberEATS is an online food ordering and delivery platform launched by the company Uber in 2014. The meals are delivered by couriers using various methods, including cars, scooters, bikes, or on foot. UberEATS is operational in over 6,000 cities in 45 countries as of 2021. Generally, a customer of Uber and UberEATS uses an application to order rides and food. Uber and UberEATS applications require a customer to create an account, including customer name, address, cellular phone number, payment method(s), and other information. The cellular phone number provided is used in the event UberEATS delivery person or the Uber driver

needs to contact the intended customer. Additionally, once an
UberEATS order is placed and subsequently delivered, UberEATS
maintains that delivery information, including restaurant, delivery
date and time, and delivery address, among other things.

67.   Based in part on the aforementioned facts, on January 9,
2026, United States Magistrate Judge Charles Eick authorized a
2703(d) Court Order requesting records associated with HARRIOTT's
Phones. Court Order authorized the requested records from January 1,
2025, to date of order, referencing case number 2:26-MJ-107.

68.   Several days later, I received and analyzed the requested
records from Uber and UberEATS pursuant to the 2703(d) Court Order.
In summary, a review of the records revealed several things. First,
HARRIOTT's current Uber and UberEATS profile was linked to the
cellular phone number HARRIOTT's Phone 2 under the customer Display
Name "Harry Fraunz" with no further identifying information (NFI).
Specifically, Uber reported that they had "conducted a reasonable and
diligent search using" HARRIOTT's Phone 2 and Uber was "unable to
find any corresponding rider's account / driver's account". Thus,
there was no other personal identifying information (i.e., name, date
of birth, driver's license number, etc.) associated with the "Harry
Fraunz" account except HARRIOTT's Phone 2, HARRIOTT's Apple Account
1, and some payment information (i.e., the last 4-digits of cards
used). The payment information appeared to be linked via Apple Pay.
This appeared to be the only active account that HARRIOTT used
between January 1, 2025, to Date of Subpoena. Thus, on initial glance
the user of the "Harry Fraunz" account would be difficult to
identify; however, based on my training, experience, and

investigation to date, I have determined that HARRIOTT is the sole user of the "Harry Fraunz" account. A review of the Uber rides and UberEATS deliveries associated with HARRIOTT's Phone 2 confirmed HARRIOTT's address as the **SUBJECT PREMISES.**

69.   Specifically, a review of the UberEATS delivery information associated with HARRIOTT's UberEATS account revealed that there were 34 food deliveries between February 7, 2025, to January 2, 2026. In total, 33 of the 34 deliveries were to the **SUBJECT PREMISES,** including as recently as January 2, 2026.

70.   A review of the Uber rides information associated with HARRIOTT's Uber account revealed that there were 68 completed rides in the United States between January 9 – December 30, 2025. 42 of the 68 completed rides domestically originated and/or terminated at GPS coordinates that were consistent with being at the **SUBJECT PREMISES,** including as recently as December 27, 2025. The rides to / from the **SUBJECT PREMISES** were consistent throughout the year and occurred in every month in 2025. Thus, HARRIOTT was picked up and/or dropped off at the **SUBJECT PREMISES.** Based on my training, experience, and investigation to date, I believe this corroborates that the **SUBJECT PREMISES** is HARRIOTT's primary residence.

71.   I also conducted a review of court authorized historical cell site information between October 18, 2025, to December 17, 2025 and prospective geolocation information obtained from HARRIOTT's Phones from December 17, 2025, to Date of Warrant. A subsequent review of the historical cell site information and prospective geolocation information for both phones was consistent with HARRIOTT residing at the **SUBJECT PREMISES.** I noted that the prospective

geolocation information for HARRIOTT's Phone 1 was generally not very accurate, i.e., between 400 – 3,000 meters; however, HARRIOTT's Phone 2's prospective geolocation information has been significantly more accurate, including as accurate as 52 meters. Despite this, the accuracy for HARRIOTT's Phones were consistent with HARRIOTT residing at the **SUBJECT PREMISES**. For example, on January 18, 2026, at 3:57 a.m. PST, the geolocation information for HARRIOTT's Phone 2 was 34.168623, -118.655616 (+/- 52 meters). Per Google Maps, the geolocation information placed HARRIOTT's Phone 2 in the center of the **SUBJECT PREMISES**. The geolocation information according to Google Maps looked like this:



72. Additionally, the court authorized prospective geolocation for HARRIOTT's Phones corroborated that HARRIOTT was likely the user of both phones because the phones often traveled in tandem. For example, on January 17, 2026, over the span of several hours, HARRIOTT's Phones traveled in tandem from the area of the **SUBJECT PREMISES** to multiple locations including Malibu and the greater Los Angeles, California. Ultimately, HARRIOTT's Phones returned to the area of the **SUBJECT PREMISES** in the early hours of January 18, 2026,

48

consistent with HARRIOTT returning to his primary residence for the
remainder of the night. HARRIOTT's Phone 2 then stayed at the **SUBJECT
PREMISES** through the late morning and into the early afternoon
consistent with HARRIOTT staying at the **SUBJECT PREMISES**. Thus, this
corroborates the identification of the **SUBJECT PREMISES** as HARRIOTT's
primary residence.

73.   On January 6, 2026, I requested assistance from HSI Los
Angeles to conduct covert physical surveillance on the **SUBJECT
PREMISES**. I have communicated with HSI Los Angeles Special Agent J.
Thompson and S. Tugg regarding their physical observations. In
summary, I learned that the **SUBJECT PREMISES** was in the Hidden Hills
gated community with restricted access via a privately contracted
security booth. For example, SA Thomspon and SA Seth were required to
identify themselves as law enforcement to be allowed to enter the
community to conduct surveillance on the **SUBJECT PREMISES**. Based on
SA Thompson and SA Seth's training and experience, the entry of
federal law enforcement into the privately gated community raised the
suspicion of the private security guards. Thus, HSI has been unable
to conduct regular covert physical surveillance without likely
compromising the ongoing investigation.

74.   To protect the ongoing investigation, SA Thompson utilized
a drone to capture several images of the **SUBJECT PREMISES** and the
property. SA Thompson did not fly directly over the property and
viewed the property from afar. During the drone surveillance, SA
Thompson observed two vehicles parked immediately in front of the
**SUBJECT PREMISES,** identified as a dark gray Range Rover and a black
Range Rover. SA Thompson was unable to get the license plates. I have

also reviewed court authorized geolocation information for HARRIOTT's
Phones for the same period, which confirmed that HARRIOTT's Phones
(i.e., HARRIOTT) were likely physically located at the **SUBJECT
PREMISES.** Despite this, based on my training, experience, and
investigation to date, I believe that the two Range Rovers were
likely attributable to Patrick HARRIOTT and Arielle HARRIOTT and were
likely leased similarly to the previous modus operandi as detailed
herein. Based on my training and experience, I know that there is a
Land Rover dealership several miles away from the **SUBJECT PREMISES**,
identified as Land Rover Woodland Hills, 22006 Erwin St, Woodland
Hills, CA 91367, United States ("Land Rover Woodland Hills"). Land
Rover Woodland Hills is less than 5 miles away from the **SUBJECT
PREMISES.** I have attempted to contact Land Rover Woodland Hills
multiple times to serve an administrative subpoena, including on
January 14, 15, and 16, 2026. On each occasion, I spoke with an
authorized representative and left a voicemail. To date, I have not
received a call back. Thus, I have not been able to gain any
additional information about the two Range Rovers observed by SA
Thompson. In summary, the **SUBJECT PREMISES** and the **SUBJECT PERSON**
have been difficult to conduct covert physical surveillance on.

IX.  **HARRIOTT USED APPLE ACCOUNTS TO COMMIT THE SUBJECT OFFENSES**

75.  In January 2026, I received records from Apple, Inc. which
confirmed HARRIOTT's Apple Accounts information. As detailed herein,
HARRIOTT's Apple Accounts were already known by law enforcement. In
general, HARRIOTT's Apple Accounts appeared to be directly and
indirectly linked to HARRIOTT and the SUBJECT OFFENSES during the
relevant period I investigated, and likely longer. The records

received confirm HARRIOTT as the subscriber and HARRIOTT's identified phone numbers and email addresses as verified phone number and email address for HARRIOTT's Apple Accounts. HARRIOTT's Apple Accounts have been observed throughout the investigation, including on bank records (i.e., JP Morgan Chase, Citibank, and Wells Fargo), Currency Transaction Reports (CTR), phone subscriber information, basic account information (i.e., Hertz, Uber, UberEATS, Zelle, Blockchain, Apple, etc.), vehicle loan applications, financial statements, among other things. Thus, HARRIOTT's Apple Accounts are intertwined with my ongoing investigation into HARRIOTT and the SUBJECT OFFENSES.

76. HARRIOTT'S Apple Account 1 (DSID 16165910171) was created on September 21, 2018 and is in the name of "Patrick Harriott". The account has HARRIOTT's reported address on his California issued driver's license and has multiple cellular phone numbers linked and verified to the account, including HARRIOTT's Phones. The account is currently registered to an "IPHONE 17 Pro Cosmic Orange 512GB" device with associated Serial Number DYC74NF7RQ, IMEIs 356661406178821 and 356661406426444 and has been since October 23, 2025. The account is "ACTIVE" and is listed as Account Type "Full iCloud (Cloud +)"[5]. The account also has two "Hide My Email"[6] accounts linked to the account,

---

[5] "Full iCloud (Cloud +)" refers to Apple's premium subscription service, iCloud+, which offers expanded cloud storage (200GB, 2TB, 6TB, 12TB, etc., beyond the free 5GB) plus advanced privacy features like iCloud Private Relay, Hide My Email, and support for HomeKit Secure Video, providing a more comprehensive and secure cloud experience for customer's Apple devices.

[6] Apple's "Hide My Email" feature creates unique, random email addresses that forward to your real inbox. It is used to protect your personal email from spam, data breaches, and marketing lists when signing up for apps, websites, or newsletters, keeping a customer's actual address private while allowing a customer to receive and reply to emails through the generated address.

including coward_gobbler_0w@icloud.com and motets-raceway-0m@icloud.com. The account has several iCloud features used, including iCloud Backup (iOS Devices), Bookmarks, Calendars, iCloud Photos, Contacts, iCloud Drive, iCloud Reminders, Mail, Mail Header, Messages in iCloud, Notes, Sign in with Apple, and Voice Memo. The account does not use the iCloud features Find My Friends, iCloud Invites, Maps, and Safary Browsing History. The records also revealed that HARRIOTT does not have Advanced Data Protection (ADP)[7] enabled on the account, including Bookmarks, iCloud Photos, iCloud Drive, iCloud Reminders, Messages in iCloud, and Notes. Thus, those iCloud features are not stored with end-to-end encryption. A review of the accounts iCloud Logs revealed that HARRIOTT's Apple Account 1 was last backed up to the iCloud on January 6, 2026.

77. HARRIOTT'S Apple Account 2 (DSID 12289199827) was created on July 15, 2018 and is in the name of "Harry Fraunz" with a billing name of "Patrick Harriott". I noted that the name "Harry Fraunz" was the same account name used on the Uber and UberEATS accounts HARRIOTT actively uses, as detailed above. The account has HARRIOTT's reported address on his California issued driver's license and has multiple cellular phone numbers linked and verified to the account, including HARRIOTT's Phones. The account is currently registered to an "IPHONE 17 Pro Silver 256GB" device with associated Serial Number FHJQJWH2JH,

---

[7] Apple Advanced Data Protection (ADP) is an optional setting that provides the highest level of security for iCloud data, extending end-to-end encryption to most iCloud services like backups, Photos, Notes, and iCloud Drive, meaning only a customer's trusted devices can decrypt this data, not even Apple. It requires setting up alternative account recovery methods (Recovery Key or Recovery Contact) because Apple no longer holds the keys for this data, ensuring robust protection against data breaches but shifting responsibility for recovery to the user.

IMEIs 352591619139043 and 352591618485017 and has been since October 23, 2025. The account is "ACTIVE" and is listed as Account Type "Full iCloud (Cloud +)". The account also has two "Hide My Email" accounts linked to the account, including fount_bristly_7f@icloud.com, vogue-levees0a@icloud.com, and plasmid_steeple0o@icloud.com. The account has several iCloud features used, including iCloud Backup (iOS Devices), Bookmarks, Calendars, iCloud Photos, Contacts, iCloud Drive, iCloud Reminders, Mail, Mail Header, Messages in iCloud, Notes, Sign in with Apple, and Voice Memo. The account does not use the iCloud features Find My Friends, iCloud Invites, Maps, and Safary Browsing History. The records also revealed that HARRIOTT does not have Advanced Data Protection (ADP) enabled on the account, including Bookmarks, iCloud Photos, iCloud Drive, iCloud Reminders, Messages in iCloud, and Notes. Thus, those iCloud features are not stored with end-to-end encryption. A review of the accounts iCloud Logs revealed that HARRIOTT's Apple Account 2 was last backed up to the iCloud on January 6, 2026.

78.    HARRIOTT's Apple Account 3 (DSID 17414243843) was created on August 24, 2020, and is in the name of "AP LUXURY". The account has HARRIOTT's reported address on his California issued driver's license and has a previously identified phone number attributable to HARRIOTT, identified as (815) 938-9500 ("HARRIOTT's Former Phone"). The account is currently registered to an "IPHONE 16 Pro Max Black 256GB" device with associated Serial Number GGN9H2JHMH, IMEIs 352356352530133 and 352356352603542 and has been since December 18, 2024. The account is "ACTIVE" and is basic Apple account. The account does not have any "Hide My Email" accounts linked to the account. The

account has several iCloud features used, Bookmarks, Calendars,
iCloud Photos, Contacts, iCloud Drive, iCloud Reminders, Messages in
iCloud, Notes, Sign in with Apple, and Voice Memo. The account does
not use the iCloud features iCloud Backup (iOS Devices), Find My
Friends, iCloud Invites, Mail, Mail Header, Maps, and Safary Browsing
History. Advanced Data Protection (ADP) is not an option on this
account. Thus, iCloud features are not stored with end-to-end
encryption. HARRIOTT's Apple Account 3 has never been backed up to
the iCloud. Therefore, HARRIOTT's Apple Accounts may contain valuable
evidence and HARRIOTT's direct and indirect involvement in the
SUBJECT OFFENSES.

79. My investigation is still ongoing into HARRIOTT, DINH, and
other co-conspirators in violation of the SUBJECT OFFENSES. However,
based on the investigation to date and detailed herein, I believe
that PATRICK JESSE HARRIOTT, KIM DINH, and other co-conspirators are
involved in sophisticated fraud and narcotics trafficking schemes in
the Central District of California and elsewhere and that HARRIOTT
uses HARRIOTT's Apple Accounts in furtherance of the SUBJECT
OFFENSES.

## X.    TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES

80. From my training and experience, and from discussions with
other investigators with dozens of years of experience investigating
identity theft and drug trafficking, I know the following:

a.    Counterfeit identity documents are often used to
commit identity theft. That is, criminals purchase counterfeit
identity documents so that they can impersonate particular
individuals, for example to withdraw money from a bank, to negotiate

a counterfeit check, or use a stolen or counterfeit credit card. In more sophisticated operations, false identity documents have been used to obtain mortgages when the criminal tricks a lender or notary into believing that the criminal is the real homeowner.

b.    Individuals involved in identity theft and fraud schemes must keep evidence of their schemes, such as victim information and accounts used in the scheme, simply to keep the scheme going. Much of this evidence is now stored on digital devices such as computers and smartphones.

c.    Generally, perpetrators of fraud and identity theft schemes maintain the evidence described above where it is close at hand and safe, such as in their residences, automobiles, and, especially with smartphones, on their person. For larger or more sophisticated frauds, participants often attempt to distance themselves from some of the incriminating evidence by renting public storage units or safety deposit boxes where they often keep the items they will not need immediate access to.

d.    Members of a criminal conspiracy must communicate with one another out of necessity. Commonly this is done by text, email, telephone, or specialty communication application, often an encrypted one such as WhatsApp, and most often by smartphone. Members of the conspiracy commonly carry their smartphones, which includes the contact information for their co-conspirators, on or near their persons, such as in their cars, residences, and safety deposit boxes.

e.    Individuals involved in drug trafficking, money laundering, and structuring schemes usually keep evidence of their schemes, such as pay-owe sheets, contact information for their co-

conspirators, suppliers and customers, and records documenting the movement of criminal proceeds on their digital devices, which they usually keep on their persons, in their vehicles, residences, and safety deposit boxes.

       f.   Drug traffickers often maintain on hand large amounts of United States currency, foreign currency, cryptocurrency, and precious metals (i.e., gold, silver, etc.) to maintain and finance their ongoing drug trafficking businesses. Such currency is often stored in their residences and vehicles.  Increasingly, criminals also pay each other through peer-to-peer payment platforms like Zelle, CashApp, and Venmo.  Their cryptocurrency and peer-to-peer payments are stored on digital devices, like Blockchain and other cryptocurrency wallets.

       g.   Communications between people buying and selling drugs usually take place by telephone calls and messages, such as email, text messages, and encrypted messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.

       h.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, pill presses, cutting agents, and proceeds of drug trafficking, and the digital devices they employ to conduct their drug trafficking.  Drug

traffickers often keep firearms in their residences or near their drug stashes in order to protect themselves from robbery.

i.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications

## XI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[8]

81.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until it is overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are

_____

[8] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

1      82.   Based on my training, experience, and information from

2  those involved in the forensic examination of digital devices, I know

3  that it is not always possible to search devices for data during a

4  search of the premises for a number of reasons, including the

5  following:

6          a.   Digital data is particularly vulnerable to inadvertent

7  or intentional modification or destruction.  Thus, often a controlled

8  environment with specially trained personnel may be necessary to

9  maintain the integrity of and to conduct a complete and accurate

10 analysis of data on digital devices, which may take substantial time,

11 particularly as to the categories of electronic evidence referenced

12 above.  Also, there are now so many types of digital devices and

13 programs that it is difficult to bring to a search site all of the

14 specialized manuals, equipment, and personnel that may be required.

15         b.   Digital devices capable of storing multiple gigabytes

16 are now commonplace.  As an example of the amount of data this

17 equates to, one gigabyte can store close to 19,000 average file size

18 (300kb) Word documents, or 614 photos with an average size of 1.5MB.

19     83.   The search warrant requests authorization to use the

20 biometric unlock features of a device, based on the following, which

21 I know from my training, experience, and review of publicly available

22 materials:

23         a.   Users may enable a biometric unlock function on some

24 digital devices.  To use this function, a user generally displays a

25 physical feature, such as a fingerprint, face, or eye, and the device

26 will automatically unlock if that physical feature matches one the

27 user has stored on the device.  To unlock a device enabled with a

28

fingerprint unlock function, a user places one or more of the user's
fingers on a device's fingerprint scanner for approximately one
second.  To unlock a device enabled with a facial, retina, or iris
recognition function, the user holds the device in front of the
user's face with the user's eyes open for approximately one second.

        b.    In some circumstances, a biometric unlock function
will not unlock a device even if enabled, such as when a device has
been restarted or inactive, has not been unlocked for a certain
period of time (often 48 hours or less), or after a certain number of
unsuccessful unlock attempts.  Thus, the opportunity to use a
biometric unlock function even on an enabled device may exist for
only a short time.  I do not know the passcodes of the devices likely
to be found in the search.

        c.    Thus, the warrant I am applying for would permit law
enforcement personnel to, with respect to any device that appears to
have a biometric sensor and falls within the scope of the warrant:
(1) depress the thumb and/or fingers of PATRICK JESSE HARRIOTT and
ARIELLE HARRIOTT on the device(s); and (2) hold the device(s) in
front of their faces with his or her eyes open to activate the
facial-, iris-, and/or retina-recognition feature.

    84.  Other than what has been described herein, to my knowledge,
the United States has not attempted to obtain this data by other
means.

//

//

//

//

60

XII. **CONCLUSION**

85.  Based upon the foregoing facts and my training and experience, I believe there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as described in Attachment B, will be found at the **SUBJECT PREMISES** and on the **SUBJECT PERSON.**

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 23rd day of January, 2026.

HONORABLE KAREN L. STEVENEON
CHIEF UNITED STATES MAGISTRATE JUDGE